17    261
f133   177
f133   576

## MASON V. MESSENGER & MAY.

1. **Half-breed tract;** SERVICE OF NOTICE. The provisions of "an act to provide for the partition of real property," approved January 4th, 1839, did not require that the proof of publication, when the notice was served by publication, should be filed before the court could proceed to determine the cause.

2. **Due course of law.** The phrase "judicial proceedings according to the course of the common law," means that the right of a person to his life, liberty or property, shall not be divested, except by a judicial determination, after due notice, in pursuance of a general law.

3. ———— JURISDICTION: PERSONAL AND CONSTRUCTIVE SERVICE. The provisions of an act of the territorial legislature of Iowa, authorizing a decree of partition upon constructive notice only to some of the parties interested, is not inconsistent with the provision of the ordinance of 1787, securing to the people of the northwest territory the benefits of "judicial proceedings according to the course of the common law."

4. **Judgment;** IMPEACHMENT FOR FRAUD. The judgment of a court having jurisdiction over the cause and the parties cannot be impeached collate-

rally for fraud, and is absolutely binding, until set aside by the tribunal in which it was rendered, or regularly reversed on error.

5. —— CASE MODIFIED. The case of *Wilhelmi* v. *Leonard*, 13 Iowa, 330, modified.

*Appeal from Van Buren District Court.*

THURSDAY, OCTOBER 20.

THIS is an action for the recovery of real property, embraced in what is known as the "Half-Breed Tract," commenced in August, 1856, in the District Court of Lee county, and taken, by change of venue, to Van Buren county, where it was tried at the June Term, 1863. On the trial, the plaintiff offered in evidence a duly certified copy of the judgment or decree of partition of the "Half-Breed Tract," rendered by the District Court of Lee county, Iowa Territory, on the 8th day of May, 1841, in the case entitled *Josiah Spaulding et al.* v. *Euphrasine Antonya et al.*; to the introduction of which the defendants "objected, on the single ground that the court which rendered it had not jurisdiction of the subject-matter, nor of the parties." Two reasons were assigned for the want of jurisdiction : 1st. The provisions of the law—"An act to provide for the partition of real property," approved January 4, 1839, see statutes of Iowa (Blue Book), page 458—in relation to publication of notice and proof thereof, were not complied with; and, 2d. The act itself was unconstitutional and void, and hence all proceedings thereunder were void. · The objections were overruled, and defendants duly excepted.

After the plaintiff had closed his evidence, the defendants, for the avowed purpose of showing that the decree was obtained by collusion and fraud of plaintiffs and others, and to invalidate it as evidence for such fraud, offered to prove certain specified facts, which would show fraud in obtaining the decree. The facts offered to be proved would

show fraud both in intent and in fact, in the action of the parties, their attorneys, and the court; that the defendants were among the persons defrauded; and that the plaintiff was sole judge of the court at the time the decree was rendered.

To the introduction of this evidence the plaintiff objected, on the sole ground that the evidence was offered and only tended to attack the decree title collaterally for fraud, which could not be done.

The court sustained the objection and excluded the evidence; to which the defendants duly excepted.

There was a verdict and judgment for the plaintiff, and defendants appeal.

*F. Semple* for the appellants.

*Rankin & McCrary* and *Henry Strong* for the appellee.

COLE, J.—I. The record in the partition case, shows that the provisions of the act, under which the partition proceedings were had in relation to publication of notice, were complied with. But it shows that the decree was rendered May 8th, 1841, and that the affidavit of publication in only one paper was filed before that date, and the affidavit of publication in the other was *filed* October 5th, 1841, *after* the decree was rendered, but before the final confirmation of the partition under it. The act did not require the proof to be *filed* before the court could proceed to determine the cause. If, in fact, the notice was published as required by the law (and the record shows that it was), it is probable that the court acquired jurisdiction (if the law was valid), and could proceed to the hearing, although the proof of such fact had not then been filed. However this may be, the decree itself in this case recites " that the publications required by the act, have been duly made." This recital is sufficient to overcome any presumption arising from the finding

*[margin note: 1. HALF-BREED TRACT: service of notice.]*

among the papers of the case, an affidavit marked "filed," after the date of the decree.

II. It is provided by the Constitution of the United States, article first, section ten, that "no state shall pass any law impairing the obligation of contracts." It is also provided by the Ordinance of 1787, which, by congressional enactment, had been extended over the Territory of Iowa, that "the inhabitants of said territory shall always be entitled to the benefits of the writ of habeas corpus, and trial by jury, of a proportionate representation of the people in the legislature, and of *judicial proceedings according to the course of the common law.*" "The legislatures of those districts or new States, shall never interfere with the primary disposal of the soil by the United States in congress assembled, nor with any regulations congress may find necessary for securing the title in such soil, to the *bona fide* purchasers." Without now deciding that question, it may be here conceded, that if the act of the Territorial Legislature of Iowa, entitled "An act to provide for the partition of real property," approved January 4th, 1839, under which the partition proceedings were had, was in conflict with either the United States Constitution, or the Ordinance of 1787, it was, to the extent of such conflict, void, and any judicial proceedings under the portions of said act, which were void by reason of such conflict, would themselves be null and void, and could not form a link in any chain of title.

The provisions of the act, which were in argument, claimed to be in conflict with the Constitution and Ordinance, are mainly embraced in the following sections:

SEC. 2. Such application (for partition) shall be by petition, describing the property and the respective interests of all the joint owners thereof, if known, and, if unknown, stating that fact also, which petition shall be verified by affidavit, and filed in the office of the clerk of the court.

SEC. 3. All persons having interests in such property liable to be affected by the proceedings, whether they be in possession, expectancy, or by way of incumbrance, must, as far as known, be made parties to the suit, either as petitioners or defendants. If not included at first, their names may be inserted at any time during the progress of the cause.

SEC. 7. If said summons be returned "not found" as to any of the defendants, or if the petitioners believe it at all probable that there may be joint owners, not known and not named in the petition, the court may, upon their application, direct the clerk to make out a notice to such defendants, not known or not found as aforesaid, to be signed by him, and furnished to the petitioners, or their attorney, on demand.

SEC. 8. Such notice shall state concisely the object of the petition aforesaid, and the names of the parties thereto, and shall require all persons interested in the property therein described (whether such persons are named in said petition or not) to appear and answer said petition, on or before the first day of the court, or that the proceedings had in the cause thereafter will be binding and conclusive of them forever.

SEC. 9. The publication of such notice once in each week, for twelve weeks successively, in some newspaper printed most convenient to the place where the court is held, and for four successive weeks in some newspaper printed at the seat of government for the Territory (such publications to be made as soon as practicable after the issuing of such notice), shall be considered in all respects equivalent to a personal service of the summons aforesaid.

SEC. 19. After all the shares and interests of the parties shall have been settled in any of the methods aforesaid, judgment shall be rendered, confirming such shares and interests, and that partition be made accordingly.

Sec. 36. Where all the parties in interest shall have been duly notified to appear and answer the petition, either by the service of the summons or by the publications hereinbefore prescribed, the judgment aforesaid shall be binding and conclusive upon all persons whatsoever.

Sec. 46. Such conveyances, so executed as aforesaid, shall be recorded in the county where the premises are situated, and shall be a bar to all persons interested in such premises who shall have been duly summoned or notified as hereinbefore directed.

The main ground of conflict of this law with the Ordinance of 1787, and the Constitution of the United States, as urged in argument, is, that it does not give to joint owners the benefit "of judicial proceedings according to the course of the common law," and thereby "impairs the obligation of contracts," and "interferes with the regulations of congress for securing the title in the soil to the *bona fide* purchasers." At common law, the process or means of compelling the defendants to appear in court, was: 1. Summons. 2. The writ of attachment or *pone*, which is sometimes the first or original process. 3. The writ of *distringas*, or distress infinite. 4. The writs of *capias ad respondendum* and *testatum capias;* or, instead of these, in the King's Bench, the bill of Middlesex, and writ of *latitat;* and in the Exchequer, the writ of *quo minus*. 5. The *alias* and *pluries* writs. 6. The exigent or writ of *exigi facias*, proclamations and outlawry. The outlawry was completed by three proclamations by the sheriff, in the places most notorious and likely to come to defendant's knowledge, a month before the outlawry could take place. Such outlawry put a man out of the protection of the law, and worked a forfeiture of all his goods and chattels to the king. The proceedings of outlawry were allowed originally only in cases of felony, but afterwards were extended to actions for trespass *vi et armis*, but finally, during the reigns

*2. —— Due course of law.*

of Henry III, Edward I, Edward III, and Henry VII, they were extended to various civil actions. 3 Blackstone's Comm., 279–292. But it certainly cannot be successfully contended that the phrase, "judicial proceedings according to the course of the common law," as used in the Ordinance of 1787, means, that the same process shall be used for notifying parties, defendants in suits at law, which were used at common law tribunals, prior to the date of its passage. It has the same meaning, in substance, as the phrase, "due process of law," used in our, and some other State Constitutions; and as the phrase, "the law of the land," used in other of the State Constitutions; or "the rules of the common law," as used in the United States Constitution.

The meaning of these various phrases as used in the Constitution, has been the subject of frequent judicial determination, and the definitions thus judicially ,declared, although in substance not radically dissimilar, have nevertheless been as various as the tribunals by which the question has been determined. It would serve no useful purpose here for us to review the very many able opinions by the United States, and the State courts upon the meaning and application of these phrases. In effect, they determine that the phrase "judicial proceedings according to the course of the common law," means that the right of a person to his life, liberty or property, shall not be divested, except by a judicial determination after due notice, in pursuance of a general law. *Taylor* v. *Porter*, 4 Hill, 146; *James* v. *Reynolds*, 2 Texas, 251; *Van Zant* v. *Waddell*, 2 Yerg., 270; *Jones* v. *Perry*, 10 Yerg., 59; *Lane* v. *Dorman*, 3 Scam., 238; *State Bank* v. *Cooper*, 2 Yerg., 605; *Budd* v. *State*, 3 Humph., 483; *Holden* v. *James*, 11 Mass., 396; *Burger* v. *Carter*, 1 McMullen (S. C.), 413; *State* v. *Simons*, 2 Speer (S. C.), 767; *Dartmouth College* v. *Woodward* (Webster's Arg.), 4 Wheat., 518; *White* v. *White*, 5 Barb. S. C. Rep., 481; *Bank of Colum-*

*bia* v. *Okely*, 4 Peter's Cond., 443; *Woodcock* v. *Bennett*, 1 Cow., 740; *Keney* v. *Beverly*, 3 Hen. Munf., 336; *Hoke* v. *Henderson*, 4 Dev., 15; *Brown* v. *Hummuel*, 6 Barr, 87; *Ervine's Appeal*, 16 Penn. State, 256; *Arrowsmith* v. *Burlingim*, 4 McLean, 498; *Reed* v. *Wright*, 2 G. Greene, 22, 24.

The further question then arises in this case, can the rights of a person to his property be divested by the action of a court, except such person first has personal service of notice of such judicial proceeding? or, in other words, can a person be deprived of his property by judgment rendered upon constructive notice only, which practically, perhaps nine times out of ten, is not actual notice?

*3. —— Jurisdiction: personal and constructive service.*

Under the regulations of the common law, as we have seen, a person could be proceeded against to outlawry, and by his failure to appear to the action, and without notice to him, all his goods and chattels were forfeited to the king. This result was attained upon constructive notice only, for it could only be had where actual notice was impossible. It is clear, therefore, that at common law, a person could be divested of his property without personal service of process or notice. Nor was the power thus to divest him of his rights, limited to his property, for by his outlawry he was divested of other personal rights, and was put out of the protection of the law; so that he was incapable of bringing an action for the redress of his injuries. 3 Blackstone's Comm., 284. If, then, by "judicial proceedings, according to the course of common law," a person could be divested of his rights to his property, upon constructive service only, and without any actual personal notice to him, it could certainly be no violation of that provision of the Ordinance of 1787, for the Legislature of the Territory of Iowa to enact that partition of real estate might be ordered by the courts upon like constructive notice. That the language used in the Ordinance was not

intended to prescribe the use of the identical process or means of compelling the defendant to appear in court, which then obtained at common law, is equally clear. For the purpose of that Ordinance was to protect *rights*, and not to prescribe *remedies*. The common law process authorized in nearly all, and required in certain actions, the personal arrest of the defendant upon a *capias ad respondendum*, and the putting in of bail, and in certain contingencies, the seizure of the defendant's property, as a means of compelling him to submit to his personal arrest and confinement thereunder, in default of bail. Can it be reasonably contended that by the Ordinance of 1787, it was intended to prohibit the legislatures of the territories from exempting the inhabitants thereof from arrest and bail, as a remedial process? The question is sufficiently answered by referring to the repeated decisions of the American courts, so numerous as to render the citing of cases unnecessary, holding that the legislatures possess the power to change the remedies, while they cannot affect the rights. *Morse* v. *Goold et al.*, 11 N. Y., 281, and authorities cited. But we are not left alone to principle in the determination of this question, it has been illustrated by the decisions of other courts. In *Jackson* v. *Babcock*, 16 N. Y., 246, the question arose upon a statute of that State, authorizing the sale and conveyance of the fee simple title to real estate, where estates therein were owned by different persons, in possession, reversion or remainder, to satisfy assessments for widening streets and for taxes, &c. The statute authorized the court to make a decree or order of sale, upon service of summons upon known resident defendants, and publication of notice to unknown owners. The title acquired under a judicial order of sale, made in a proceeding under this statute, was assailed on the ground that the statute was unconstitutional. The opinion was delivered by JOHNSON, J., in which the whole court concurred, holding the statute

constitutional. JOHNSON, J., says: "I think it, then, not doubtful that the Legislature's intention was, that a sale, under the act of 1855, should give an absolute title and should cut off invested estates as well as vested estates. A similar effect is produced upon a sale under the statute as to partition (2, 327, 330, §§ 61, 81), and upon a mode of notice from which that provided in this act is almost literally taken. (2 Rev. Stat., 253, § 84, 2d ed.; Laws of 1831, ch. 200.) That such a provision is proper to be made, is as evident in this case, as it is in partition. *  *  *  *

"It is a salutary power, when exercised under due restrictions, and its existence cannot be questioned. In the form in which it at present stands, the act may furnish too convenient means for selling lands otherwise inalienable, but that is matter of legislative consideration." *In the matter of the Empire City Bank*, 18 N. Y., 199, which was a proceeding to enforce the personal liability of stockholders for the payment of the debts of an insolvent bank, the court, per DENIO, J., say: "The provision for giving notice was relied on by the counsel for the stockholders, as evidence that the proceeding was not due process of law. The notice of hearing before the referee is to be personal, or by service at the residence of the party, as to the stockholders who live in the county where the bank was located, and by advertisement in the State, and in newspapers in the county, as to all other stockholders. It may therefore happen that some of the persons who are made liable will not have received actual notice, and the question is, whether personal service of process, or actual notice to the party, is essential to constitute due process of law. We have not been referred to any adjudications, holding that no man's rights of property can be affected by a judicial proceeding unless he have personal notice. It may be admitted that a statute which should authorize any debt or damages to be adjudged against a person, upon a purely *ex parte* pro-

ceeding, without a pretense of notice or any provision for defending, would be a violation of the constitution, and be void; but where the legislature has prescribed a kind of notice, by which it is reasonably probable that the party proceeded against will be apprised of what is going on against him, and an opportunity is afforded him to defend, I am of opinion that the courts have not the power to pronounce the proceeding illegal. The legislature has uniformly acted upon that understanding of the Constitution. Thus, attachments are allowed against parties represented to be absent, absconding or concealed debtors, and the proceeding results in the sale of their property and the appropriation of its avails to the benefit of the alleged creditors; and the only notice required is a publication in certain newspapers. (2 R. S., 3, §§ 1, 28.) So in justices' courts, attachments are authorized against persons who have departed, or are about to depart from the county, or who keep concealed with a certain intent; and the notice required is the leaving the attachment at the last place of residence of the party, if such place exists, or, if not, with the person in whose possession the goods may be found. (2 Rev. Stat., 230, § 31.) There are many other examples of the same kind, such as foreclosing mortgages by advertisement; discharging an insolvent debtor upon a petition of a portion of his creditors, those not petitioning being notified of the proceeding only by advertisement in the newspapers. Various prudential regulations are made with respect to these remedies; but it may possibly happen, notwithstanding all these precautions, that a citizen who owes nothing, and has done none of the acts mentioned in the statutes, may be deprived of his estate without any actual knowledge of the process by which it has been taken from him. If we hold, as we must, in order to sustain this legislation, that the Constitution does not positively require personal notice in order to constitute a

legal proceeding due process of law, it then belongs to the legislature to determine, in the particular instance, whether the case calls for this kind of exceptional legislation, and what manner of constructive notice shall be sufficient to reasonably apprise the party proceeded against, of the legal steps which are taken against him." This language, which appears to have been concurred in by the whole court, meets with our entire approval, and the instances mentioned, where the legislature has authorized judicial proceedings against parties upon constructive notice only, might also be extended so as to include partition proceedings, and still have their parallel in this State, and in nearly every State in the Union. And without the power thus to legislate and adjudicate, it would be in the power of non-residents and unknown persons to secure an endless credit, to avoid the payment of their just debts and to hold the rights of citizens in real property owned jointly with them, practically, forever in abeyance. We therefore, conclude, both upon principle and authority, that the act of the legislature under which the partition proceedings were had, was not unconstitutional, nor in violation of the Ordinance of 1787.

III. The next, and only further question made in the case, is whether the defendants have the right to introduce evidence in this case to show that the decree of partition was obtained by fraud. Or, as the question was forcibly and quaintly stated by the counsel for appellant in his oral argument, that since the plaintiff has introduced the Partition Decree as his witness, whether the defendants may impeach that witness by showing its bad character on account of fraud. This paraphrase, however, does not change the real question nor vary the rights of the parties. This very question has been four times presented to and decided by this court in relation to this identical decree. *Wright* v. *Marsh,*

4. JUDG-MENT: impeachment for fraud.

*Lee & Delavan,* 2 G. Greene, 95; *Barney* v. *Chittenden et al.,* Id., 165; *Kerr* v. *Leighton,* Id., 196; *Hypfner* v. *Walsh et al.,* 3 Id., 509. And the decree has been indirectly sustained by this court in other cases. *Wright* v. *Millard,* 3 G. Greene, 86; *Brace* v. *Reid,* Id., 422; *Gillis* v. *Black,* 6 Iowa, 439; *Wright* v. *Keithler,* 7 Iowa, 92. The learned counsel for appellant, in his argument, cited and called our especial attention to, the case of *Horace H. Day* v. *The New England Car Spring Company,* decided by Judge BETTS, of the United States Circuit (Second Circuit, New York), October, 1854, reported in Livingston's Law Magazine for January, 1855, page 44. We have given that case our careful attention, and find that the question decided was that a party had the right to collaterally attack and impeach for fraud, a deed conveying a patent right, which had been introduced in evidence by the opposite party. Judge BETTS, in his opinion, which is able, elaborate and exhaustive upon the question before him, cites very many cases, and while they all bear more or less upon the question involved in that case, not a single case cited goes so far as to hold that a judgment of a court having jurisdiction of the subject matter and the parties, could be impeached collaterally for fraud. But all the cases cited refer to licenses, contracts, obligations, conveyances, or other instruments *inter-partes,* and hold that such specialties or instruments, may be collaterally impeached for fraud.

Our attention was also called especially to the case of *Calcote* v. *Stanton et al.,* decided by the Superior Court of Chancery of Mississippi, June, 1854, and reported in Livingston's Law Magazine for October, 1854, page 653. That case decides that an order or judgment of discharge in bankruptcy may be impeached collaterally for fraud, because "the bankrupt law itself gives him a right (if not for other reasons debarred) to impeach it for fraud,"

and the court in its reasoning says, as the discharge may be pleaded everywhere, so it may be, under the act itself impeached everywhere. And also to the case of *Keyes* v. *Keyes*, reported in Livingston's Law Magazine for November, 1853 (also 2d Foster's N. H. Rep., 553), holding that a court of equity has power to declare a contract of marriage void, when a party was fraudulently induced to form it. The court, in its reasoning, says that " no doubt exists that the marriage might be treated as null and void by every court in this State, in which the question of its validity might arise collaterally." Neither of these cases, then, are in conflict with the general rule that the proceedings of a court, having jurisdiction over the cause and the parties, cannot be questioned collaterally, and are absolutely binding, until set aside by the tribunal in which they occurred, or regularly reversed on error. The proceedings in the partition suit fall within this general rule, and the rights of the parties must therefore be governed by it. There are to be found in the books, certain cases in which the courts have used language sometimes pertinent to the question before them for adjudication, and at other times mere *dicta*, holding that judgments could be attacked collaterally for fraud. But it is believed that nearly every case will be found exceptional in its character, such as fraud apparent on the face of the record, a judgment by confession or upon a feigned issue, or the language used mere *dicta*. In *Webster* v. *Reid*, 11th Howard (U. S.), 437, the court say " when a judgment is brought collaterally before the court as evidence, it may be shown to be void upon its face by a want of notice to the person against whom judgment was entered, or for fraud."

While this language may justly be said to be of doubtful meaning, it would not be unwarranted construction or transposition of it, to say that "it may be shown to be void upon its face for fraud or by a want of notice to the person

against whom it was entered." With this transposition or construction of the language used, the court decides that a judgment may be collaterally shown to be void for fraud on its face, which is not in conflict with the general rule. In *Gaines* v. *Relf et al.*, 12 How. U. S., 472, the plaintiff had, by a fraudulent combination with one Patterson for that purpose, obtained a decree against him, establishing the legitimacy and heirship of plaintiff to one Daniel Clark, and then introduced that decree, thus obtained, as evidence in the case against Relf *et al.*

The court held, " that the decree of this court in Charles Patterson's case does not affect these defendants, for two reasons : *First*. Because they were no parties to it ; and, *Second*. Because it was no earnest controversy." This case seems to have been regarded by the court as exceptional, and not in conflict with the general rule as stated.

. In the case of *Wilhelmi* v. *Leonard*, 13 Iowa, 330, this court held that it was not error for the court below to

5. —— Case modified. instruct the jury that it was their province to inquire whether, in point of fact, the judgment by confession, which had been introduced in evidence, was fraudulent. Whether there is legally any difference between a judgment by voluntary confession out of term time, and a judgment obtained by due course of litigation, it is not necessary for us now to decide. The real question in that case, was not whether the judgment plaintiff recovered his judgment through fraud practiced by him upon the judgment debtor ; but, whether the plaintiff and defendant therein had, by fraud and collusion, caused such judgment by confession to be rendered for the purpose of defrauding the other creditors of the judgment debtor. That this question was correctly decided, cannot, we think, be doubted, and any language used further than necessary to determine such question, is, of course, but mere *dicta*. We have referred to these cases for the purpose of showing

some of the exceptions to the general rule, which we regard as established beyond question, rather than with any purpose to review authorities generally upon the subject.

The counsel, in argument, discussed at some length the question whether a partition proceeding was or not a proceeding *in res*, and the court having unquestioned jurisdiction of the *rem*, the Half-Breed tract, situated in the county where the court was held, it could make partition without necessarily first acquiring jurisdiction of the persons also.

The view which we have taken of the other questions in the case, effectually determines the cause, and renders it unnecessary for us now to decide this latter question thus made in argument by counsel.

Affirmed.

Lowe, J., took no part in the determination of this case.