## Scott v. Strobach.

### Contest as to Right to Sheriff's Office.

1. *Incompatibility of offices of sheriff and member of General Assembly.* — Under the Constitution of this State, one person cannot at the same time hold the incompatible offices of sheriff and member of the General Assembly ; yet a member of the General Assembly may be elected to the office of sheriff, and his acceptance of the latter office does not vacate the first, though it furnishes ground to compel him to elect which office he will retain. (BRICKELL, J., dissenting, held that the acceptance of the second office, *ipso facto,* vacated the first.)

2. *Alien's capacity to hold office.* — An alien by birth, who has not been naturalized, and has not declared his intention to become a citizen of the United States, is not eligible to the office of sheriff.

3. *Certificate of naturalization.* — A certificate of naturalization, granted by a court having jurisdiction under the acts of Congress, stands on the footing of a judgment of a court of competent jurisdiction, and cannot be collaterally impeached, unless a want of jurisdiction is apparent on its face.

4. *Same.* — A recital in a certificate of naturalization, that the person named therein appeared in open court, "and makes *application* to be admitted a citizen," &c., will be construed to mean, when the certificate is collaterally assailed, that the application was made by petition ; and where the certificate recites that it appeared to the satisfaction of the court, by proof, that the applicant "is entitled to the benefit of the Act of Congress of 17th July, 1862" (which authorizes the naturalization of aliens who had enlisted in and been honorably discharged from the military service of the United States, on proof of one year's residence), "and that he has been honorably discharged from the service of the United States," — these recitals will be held sufficient in a collateral attack.

5. *Same.* — A certificate of naturalization, granted by a court of competent jurisdiction, and valid on its face, cannot be collaterally impeached, on the ground that its recitals are untrue, and that it was procured by fraud and perjury.

6. *Contest of election before probate judge; appeal triable de novo.* — When an election is contested before the probate judge, under the 65th section of the general election law of 1868 (Sess. Acts 1868, pp. 281-4), and an appeal is taken from his decision under the 76th section, the appeal is triable in the Circuit Court *de novo,* and not on errors assigned.

[Scott *v.* Strobach.]

APPEAL from the Circuit Court of Montgomery.

Tried before the Hon. JAMES Q. SMITH.

This was a contest between Charles H. Scott and Paul Strobach, as to the right to the office of sheriff of said county. At the general election held in November, 1871, Strobach received the largest number of votes, as shown by the official returns filed in the office of the secretary of state, and he received the governor's commission. Within fifteen days after the election, Scott, who received the next highest number of votes, filed in the office of the probate judge of the county a notice of contest on his part, accompanied with a statement of the specific grounds on which he contested the election, as required by the 65th section of the general election law of 1868. The grounds of contest, as specified, were: 1st, that Strobach was ineligible to the office of sheriff, because, at the time of the election, and also at the time when he received his commission as sheriff, he was a member of the General Assembly ; 2d, that he was ineligible to said office, because he was by birth an alien, and had never been naturalized, and had not declared his intention to become a citizen of the United States ; and, 3d, that a certificate of naturalization which he had procured from the City Court of Montgomery, on the 11th October, 1867, and which was made an exhibit to the statement of contest, was procured by fraud, and its recitals were not true in fact. The certificate was in these words : —

" This day, being Friday, October 11th, 1867, personally appeared in open court Paul Strobach, and makes application to be admitted a citizen of the United States ; and it appearing to the satisfaction of the court, by proof, that the said Paul Strobach is of the age of twenty-one years, and is entitled to the benefit of the Act of Congress of July 17th, 1862, and that he has resided in the United States for more than one year previous to this date ; and having proven to the satisfaction of the court that he has been honorably discharged from the service of the United States, and having taken the following oath, to wit : ' I, Paul Strobach, do declare on oath, that it is *bonâ fide* my intention to become a citizen of the United States, and do hereby renounce and abjure all allegiance and fidelity to every foreign prince, power, sovereignty, or state whatever, and especially to Francis Joseph, Emperor of Austria, whose subject *he* last *was*, and to support the Constitution of the United States.' It is therefore considered by the court, that he be, and he is hereby, admitted a citizen of the United States."

On the day appointed for the hearing of the contest, Strobach filed a demurrer to the contestant's statement, on the ground that his certificate of naturalization could not be col-

[Scott v. Strobach.]

laterally impeached, and that it was not averred in said statement that he had ever performed any act whatever pertaining to the office of a member of the legislature after he had qualified as sheriff. The probate judge overruled the demurrer, to which ruling the defendant excepted; and he then filed an answer, denying that he was ineligible to the office of sheriff, or that he was not a naturalized citizen of the United States, or that his certificate of naturalization was procured by fraud. This answer was struck from the files, on motion of the contestant, on the ground of insufficiency; and the defendant declining to answer further, judgment was rendered against him, declaring that he was ineligible as sheriff at the time of the election, and that said contestant was duly elected sheriff, and entitled to a certificate of election. To these rulings, and to the judgment rendered, a bill of exceptions was reserved by Strobach, and an appeal taken to the Circuit Court.

On the trial in the Circuit Court, Strobach moved to dismiss the contestant's statement, as filed in the Probate Court, and to reverse and declare void the judgment of the probate judge. The contestant objected to this motion being entertained by the court, and claimed an affirmance of the judgment for want of an assignment of errors. The court overruled his objection, and granted the motion, reversing, annulling, and declaring void the judgment of the probate judge; to which action and judgment of the court an exception was reserved by said Scott, and he now assigns the same as error in this court.

RICE, JONES & WILEY, for appellant. — 1. The case ought to have been tried in the Circuit Court, on errors assigned on the record from the Probate Court. In this particular, the provisions of the election law of 1868 are substantially the same with sections 345 to 354 of the Revised Code, which were judicially construed in *Griffin* v. *Wall*, 32 Ala. 149.

2. Strobach was not eligible to the office of sheriff, because he was, at the time of his election, a member of the General Assembly. Eligibility relates to the capacity of holding an office, as well as the capacity of being elected to it. *Carson* v. *McPhetridge*, 15 Indiana, 327. There is no incompatibility whatever, in the common law sense of the term, between the two offices. *Commonwealth* v. *Shaver*, 3 Watts & Serg. 338; *Hallett* v. *Lee*, 3 Ala. 134. The acceptance of the office of sheriff, then, did not vacate Strobach's seat in the General Assembly; and he was entitled to hold both offices, and discharge the duties of both, until his seat was declared vacant by the house to which he belonged, unless the courts will give effect to the constitutional prohibition. *People* v. *Carrique*, 2 Hill N. Y. 93, and authorities cited above. The sheriff is

certainly a member of the executive department of the government, and is, therefore, expressly forbidden to exercise any of the powers belonging to either of the other departments; and on the other hand, a member of the legislative department is equally forbidden to hold or exercise any of the powers of an office belonging to the executive department. A vacancy in an office, during the term for which a living person has been elected, can only be declared by a competent tribunal; and until the vacancy is judicially declared, the officer holds. *Sprowl* v. *Lawrence,* 33 Ala. 674; *State* v. *Falconer,* 44 Ala. 696; 2 Kent, 312; 13 La. 503; *Crawford* v. *Howard,* 9 Georgia, 316; *People* v. *Carrique,* 2 Hill N. Y. 93. In this case, there is no judicial tribunal which can decide that a vacancy exists in the legislature; the power to determine that question being expressly conferred on the house to which the member belongs. It is the duty of the courts, equally with the other departments of the government, to give effect to constitutional provisions; and that can only be done here, by holding that the word "ineligible," as used in the Constitution, means incapable of holding, exercising, or executing the powers of an office. *Clarke* v. *State,* 3 Nevada, 570; *Carson* v. *McPhetridge,* 15 Indiana, 331; *People* v. *Whitman,* 10 California, 43.

In *Gardner* v. *The State* (43 Ala. 234), it was decided, that a person claiming to hold the office of probate judge, if eligible at the time of his election, and duly elected, and installed into office, cannot be removed by *quo warranto;* that the only remedy is by impeachment or removal, on the address of two thirds of the General Assembly. Suppose, then, that the lieutenant-governor, while still holding that office, should be elected a circuit judge, and qualify as by law prescribed, without resigning his former office; what is to prevent him from holding the two offices until removed, unless the Constitution operates *proprio vigore,* and makes him ineligible to the second office while holding the first?

3. Strobach was also ineligible, because he was an alien, and had not complied with the acts of Congress regulating the naturalization of foreigners. The mode prescribed by law must be strictly pursued, and no part of it can be dispensed with. The certificate of naturalization, which he procured in 1867, does not show that he made application by petition; nor that he ever enlisted in the military service of the United States; nor that he was honorably discharged from that service; nor that he took the oath prescribed by the act of Congress. In all these particulars, it is fatally defective. 3 Phil. Ev. (C. & H. Notes, ed. 1839), 1012; *Smith* v. *Rice,* 11 Mass. 513; *Spratt* v. *Spratt,* 4 Peters, 48.

[Scott *v.* Strobach.]

4. The proceeding for naturalization is strictly statutory, and not according to the course of the common law. It is purely *ex parte*, and not revisable on error or appeal. Hence, when it is produced against another person, its recitals are not conclusive on him, but he may aver and prove their falsity. *Smith* v. *Rice*, 11 Mass. 513 ; *Davol* v. *Davol*, 13 Mass. 264 ; *Scammell* v. *Wilkinson*, 2 East, 553.

5. A party cannot claim any benefit under a judgment procured by his own fraudulent act. Whenever he sets up such fraudulent judgment in another court, and claims a benefit under it, it may be collaterally assailed on account of the fraud. *Fermor's Case*, 3 Coke, 77 ; *Duchess of Kingston's Case*, 20 Howell's State Trials ; *McCravey* v. *Remson*, 19 Ala. 430 ; *Davidson* v. *Shipman*, 6 Ala. 33 ; *Borden* v. *Fitch*, 15 Johns. 121 ; *Thompson* v. *The State*, 28 Ala. 18, and cases cited on that page ; *Kennedy* v. *Daly*, 1 Sch. & Lef. 378 ; *Carter* v. *Castleberry*, 5 Ala. 277.

WATTS & TROY and STONE & CLOPTON, *contra.* — 1. The statute of 1866, as found in sections 384, 385, and 386 of the Revised Code, which has been passed since the decision in the case of *Griffin* v. *Wall*, 32 Ala., expressly provides that the trial in the Circuit Court shall be *de novo*. These sections are strictly regulations of appeals in election cases, and are not repealed by section 99 of the election law of 1868. If those sections are held to be repealed, then there is no provision for a trial by jury in case of a contested election, and the law itself is unconstitutional. *Wammack* v. *Holloway*, 2 Ala. 33 ; *Thomas* v. *Bibb*, 44 Ala. 721.

2. The certificate of naturalization, like any other judgment of the City Court, is conclusive on everybody, and cannot be collaterally impeached. *Starke* v. *Chesapeake Insurance Co.* 7 Cranch, 420 ; *Campbell* v. *Gordon*, 6 Cranch, 176 ; *Spratt* v. *Spratt*, 4 Peters, 393, 408 ; *Harley* v. *The State*, 40 Ala. 697 ; *McDonald* v. *Richards*, 1 McCord, 187 ; *Ritchie* v. *Putnam*, 13 Wendell, 525 ; *Priest* v. *Cummings*, 16 Wendell, 625 ; *Commonwealth* v. *Lee*, Leading Election Cases, 98.

3. Naturalization proceedings must be liberally construed. *Priest* v. *Cummings*, 16 Wendell, 625. Fairly construed, Strobach's certificate shows a substantial compliance with the law.

4. The third article of the State Constitution is simply a declaration of the distribution of the powers of government. It was not intended to prescribe the qualifications of persons to be elected to offices, or to prescribe what should constitute eligibility of any person to be appointed or elected to any office. There is no clause of the Constitution which prohibits a mem-

[Scott *v.* Strobach.]

ber of the General Assembly from being elected to the office of governor, or judge, or any other office within the gift of the people. On the contrary, this right is distinctly recognized in the clause which declares that no member of the legislature shall, " during the term for which he shall have been elected, be appointed to any civil office of profit under this State, which shall have been created, or the emoluments of which shall have been increased during such term, except such offices as may be filled by election by the people." The right to hold an office, and to exercise its powers and duties, is a very different thing from eligibility, or the capacity of being elected. A man may, while holding one office, be elected to another, whose duties are incompatible with the first ; and in such case, his acceptance of the latter office, *ipso facto*, is a resignation of the first. *People* v. *Carrique*, 2 Hill N. Y. 93 ; Angell & Ames on Corporations, §§ 433–4 ; Cushing's Law and Practice of Legislative Assemblies, §§ 68, 78.

BRICKELL, J. — This case presents grave and important questions, which we have patiently and carefully considered. The first of these is, was the appellee, being at the time of his election a member of the General Assembly, eligible to the office of sheriff. His ineligibility is averred to arise, not from any express constitutional interdiction, but from a fair and just interpretation and construction of the third article of the Constitution. This article is entitled, " Distribution of Powers of Government," and declares : " The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit : those which are legislative, to one ; those which are executive, to another ; and those which are judicial, to another. No person, or collection of persons, being of one of these departments, shall exercise any power properly belonging to another, except in the instances hereinafter expressly directed or provided."

Justly to interpret and construe a legislative enactment, or a constitutional provision, we must inquire into its origin, and the motive of the lawgiver. This article of the Constitution has a history older than the State of Alabama ; as old, indeed, as constitutional liberty on this continent. The decentralization of power, so that its exercise would be committed to different departments of the government, or, in the language of state constitutions, " to separate bodies of magistracy," was a controlling, fundamental maxim with the founders of our federal government. In the Federalist, it is said: " The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and

[Scott v. Strobach.]

whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." In England, the principle and theory prevails of drawing, broadly, a line of demarcation between executive, legislative, and judicial powers, intrusting them to separate and distinct bodies. There, it is the result of long usage, judicial decision, and parliamentary declaration and practice. The jealousy of those who laid the foundations of our government demanded an express and careful separation of these powers in the federal Constitution. In state constitutions, they are not only carefully separated, and declared to reside in separate bodies, created by the constitutions, but generally there is in the constitutions, as in ours, an express prohibition against the exercise by any one of these bodies, or by any person belonging to either of them, of any power properly belonging to another, unless it is otherwise declared. It is probable no such prohibition was necessary, as it may well be deemed a logical and legal consequence from the express separation and division of the powers of the government.

The purpose of this article of the Constitution was to separate and distribute the powers of the government, and to prevent their centralization, by prohibiting the same body or individual from the exercise of power pertaining to any two of these departments. All the objects which governments are instituted to accomplish, and all individual rights, depend principally, if not exclusively, upon the observance and preservation of this distribution of power. Separate bodies, exercising distinct powers, supreme and independent within their constitutional sphere, operate as checks, the one upon the other, guarding against usurpation, and the absorption by either of power assigned by the Constitution to another. The legislative, executive, and judicial departments are subject to the limitations of the Constitution, an embodiment of the sovereignty and will of the people of the State. They do not act separately and independently of each other; the concurrence of their action is essential to the vindication of individual right, and to the maintenance of the dignity and authority of the State. In the General Assembly resides the duty and power of ordaining laws; in the judiciary, the exposition and interpretation of the law; in the executive, the enforcement and execution of the law, as ordained by the legislature, in accordance with the exposition and interpretation of the judiciary. The duty and power of these departments distinguish the one from the other, and furnish the criterion by which we determine to which of the departments an officer belongs.

A sheriff is a constitutional officer. The office does not owe its origin to legislation. "A sheriff shall be elected in each

county, by the qualified electors thereof," is the mandate of
the Constitution in the article creating the executive depart-
ment, and defining and declaring many of its powers and
duties. He was an officer known to the common law, and de-
fined as "a county officer, representing the executive or admin-
istrative power of the State, within his county." 2 Bouv. Law
Dict. title "Sheriff." At common law, in addition to minis-
terial or executive power, he was vested with judicial, or *quasi*
judicial power. Here, his duty and authority are purely min-
isterial and executive. This being true, it follows that, by the
Constitution, the appellee, being a member of the General As-
sembly, could not exercise the authority of a sheriff; or, being
sheriff, could not exercise the power of a member of the General
Assembly. This the Constitution expressly forbids. But the
Constitution is satisfied when the officer is confined in the ex-
ercise of power, and in the discharge of duty, to a single
department of the government. Beyond this its prohibitions
do not extend in letter, spirit, or in the evil to be avoided. The
constitutional prohibition is not directed against the election to
office, in one of the departments of government, of a person
holding office in another department; but it is against the hold-
ing of two offices, whereby the same individual would exercise
power and discharge duty pertaining to different branches of
the government.

To apply directly to this case the mischief guarded against
by the Constitution, the appellee cannot, as a member of the
General Assembly, ordain the law which he is, as sheriff, to ex-
ecute. The constitutional prohibition refers, then, directly to
the exercise of power. It is intended, also, to insure a faithful
performance of official duty, by preventing the citizen from
assuming incompatible and inconsistent duties. It was not in-
tended to prescribe eligibility to office. This, we think, is
evident, from the purpose which the article is intended to
accomplish from its language, and from other provisions of the
Constitution. The 10th section of the fourth article expressly
declares the judges of the Supreme Court, Circuit Courts, and
Courts of Chancery shall not "hold any office (except judicial
offices) of profit or trust, under this State or the United
States, during the term for which they have been elected, nor
under any other power during their continuance in office."
Now, if the judges were, by force of the third article, rendered
ineligible of election to any executive or legislative office in the
State, much of the section above quoted is without meaning,
and accomplishes nothing. It has been correctly argued by
the counsel for the appellee, that the 19th section of the fourth
article, by its very terms, recognizes the eligibility of a mem-
ber of the General Assembly to any office filled by election by

[Scott v. Strobach.]

the people, or to any office not created, or the emoluments of which are not increased, during his term as member of the General Assembly. This recognition is not consistent with the theory that the third article creates ineligibility to office.

The capacity of the citizen to be elected to, and hold office, and the power of the people to elect, cannot be circumscribed except by constitutional restraint and limitation. The capacity of the citizen to accept and hold office must be equal, in measure and extent, to the power and right of the people to elect. If it were otherwise, the power and right of the people would be vain and nugatory. They would have the power and right of electing; but he who was of their choice would not have the capacity of accepting and holding. The right of suffrage would thereby, and to that extent, be annulled. If a citizen, who is a qualified elector, and who is not obnoxious to the disqualification imposed by the 3d section of the seventh article, or to some other disqualifying clause of the Constitution, is, while holding office, elected by the people to another, we hold he is eligible, and has the unqualified right of accepting and holding the latter office. If his acceptance thereof requires the exercise of power and discharge of duty pertaining to another department of the government than the power and duty of the former office, the Constitution intervenes, and prohibits him from the exercise of that power and duty, and by its own force works a renunciation and vacation of the former office.

The common law prohibited the holding of incompatible and inconsistent offices. It did not declare void the appointment of a person to a second office incompatible with the first. But it declares the acceptance of the second office, *ipso facto*, vacated the first. The acceptance of the second was an absolute determination of the original office, leaving no shadow of title in the original possessor, so that neither amotion nor *quo warranto* was necessary before another could be appointed or elected. 7 Bacon's Abr. 315; Ang. & Ames on Corp. §§ 433–34. Incompatibility of offices existed at common law, when from the nature of the offices — the respective duties they imposed, or the relation they bore to each other — or pure considerations of public policy, there was a manifest impropriety in one incumbent retaining both. It did not arise because the incumbent, by the acceptance of one office, may temporarily have placed himself in a position rendering it impossible to discharge the duties of another. *Bryan* v. *Cattell*, 15 Iowa, 537.

The election of the appellee to the office of sheriff did not fill that office, nor vacate his seat in the General Assembly. He filled the office of sheriff when he received the commission of the governor, executed the official bond required by law, and

took the oath of office. *State* v. *Mc Collister*, 11 Ohio, 46. Then he assumed duties and powers pertaining to the executive department. Then the Constitution intervened, and incapacitated him from exercising power inherent in, or belonging to, the legislative or judicial department of the government. The Constitution then intervening, in the very nature of things operated an absolute vacation of his seat in the General Assembly. The renunciation of his seat in the General Assembly no longer depended on the volition of the appellee. He had exercised and declared his volition, as certainly and as expressly as if a formal resignation had preceded or attended his acceptance of the office of sheriff. No further act of his, nor any act of the General Assembly, was necessary to its consummation. *Owens* v. *Draper*, 45 Md. 355; *People* v. *Carrique*, 2 Hill, 93; *State* v. *Hutt*, 2 Ark. 282; *Curran* v. *State Bank*, 5 Eng. 142.

As has been argued, courts may be, and doubtless are, powerless to enforce this renunciation. So they would have been powerless to enforce his resignation, or to enforce the exclusion from the General Assembly of any member who has not the constitutional qualification. But the Constitution is committed to the keeping of the General Assembly as well as to the care of the courts; and if they fail or falter in their duty, the people have more availing remedies than any dependent on judicial proceedings.

We do not think the authorities to which we have been referred conflict with our views; but, on the contrary, one of them tends strongly to support them. The Constitution of Kentucky declares, " No person, holding or exercising any office of trust or profit under the United States, or either of them, or under any foreign power, shall be eligible as a member of the General Assembly of this Commonwealth, or hold or exercise any office of trust or profit under the same." A postmaster under the government of the United States, while holding and exercising office, was commissioned as a justice of the peace, and entered on the discharge of the duties of the latter office. His eligibility to the office of justice came in question before the Court of Appeals, and it was insisted that, by accepting that office, he had vacated the office of postmaster. The incompatibility of the two offices was admitted. The court, conceding the principle, that the acceptance of a second office vacates, *ipso facto*, the former, say it is applicable only when the two offices emanate from the same government; because, then, " the government, having power over both offices, can and will enforce the renunciation implied in that act, by regarding the first office as vacated, by prohibiting or even punishing any attempt further to exercise it, or by filling it

[Scott v. Strobach.]

with another at its pleasure." As the government of Kentucky was impotent to enforce the vacation of the office of postmaster, held under the government of the United States, the court declared the person filling that office incapable of accepting and holding the office of justice of the peace. *Rodman* v. *Harcourt*, 4 B. Monroe, 224. The office of sheriff, and a seat in the General Assembly, the appellee derived from the government of Alabama. The government of Alabama has full power to enforce the renunciation of the one or the other. If such had been the relation of the officer in the case cited from the Kentucky Court of Appeals, we cannot doubt their decision would have been a precedent supporting our conclusion. The cases cited of *State* v. *Clarke* (3 Nevada, 566), and of *Carson* v. *McPhetridge* (15 Indiana, 327), depended on particular clauses of the constitutions of those states, and have no bearing on the question we have considered.

2. The statute under which this proceeding was initiated authorizes any qualified elector to contest an election, because of the ineligibility of the successful candidate. The statement of contest filed in this case assails the eligibility of the appellee, on the alleged ground, that by birth he was an alien, not naturalized, and not having previous to his election declared his intention to become a citizen of the United States. If these facts exist, the ineligibility of the appellee cannot be denied. He would not be a qualified elector. He would not be entitled to any of the rights and privileges, and not subject to many of the duties of citizenship. He would be incapable of holding, or transmitting by descent, real estate. He would be entitled to nothing from the government but personal protection, so long as he yielded obedience to the general laws for the maintenance of peace and the preservation of order. It would be at war with the spirit and theory of our institutions, to recognize as eligible to any public office one who is not a qualified voter. The right of suffrage and the capacity to hold office, unless otherwise expressly declared, must coexist.

3. The statement, however, avers that the appellee, in October, 1867, more than four years prior to his election, obtained from the City Court of Montgomery a certificate of naturalization, and exhibits a copy of this certificate, properly authenticated. The validity of this certificate is assailed, because, as is alleged, it does not conform to the acts of Congress, and does not disclose the existence of the facts necessary to give the court jurisdiction to grant it. The Congress of the United States has delegated to the courts of record of the several states, having common law jurisdiction, a seal, and a clerk or prothonotary, jurisdiction of the naturalization of foreigners. In the exercise of this jurisdiction, the courts of the states act

judicially, not ministerially. They must receive and weigh evidence. On the evidence, they must pronounce judgment, either withholding or yielding assent to the citizenship of the foreigner. *In the Matter of Clark*, 18 Barb. 444. The courts of the State exercise the power thus conferred, rather as matter of comity than as matter of duty. The power conferred is not a part of the judicial power which the Constitution declares shall be vested in a supreme court, and such inferior courts as Congress may from time to time ordain and establish, and no part of which can be transferred to, or vested in the courts of the several states. It springs out of, and is incidental to, the declared power of Congress "to establish an uniform rule of naturalization." When the certificate of naturalization is granted by a court having jurisdiction under the acts of Congress, it is placed on the footing of the judgment of a court of competent jurisdiction, and is not examinable collaterally, unless there is a want of jurisdiction apparent on its face. We adopt the language of Chief Justice MARSHALL: "The various acts upon the subject submit the decision on the right of aliens to admission as citizens to courts of record. They are to receive testimony, to compare it with the law, and to judge on both law and fact. The judgment is entered on record as the judgment of the court. It seems to us, if it be in legal form, to close all inquiry; and, like every other judgment, to be complete evidence of its own validity." *Spratt* v. *Spratt*, 4 Peters, 393; *Harley* v. *State*, 40 Ala. 685. If the intendments and presumptions, made by the law in favor of the regularity of judicial proceedings, can be more liberally applied to one class of cases than to another, they should be to a judgment defining the *status* of an individual, conferring rights and privileges, and becoming an essential element of the title and succession of estates. It would serve no good purpose, and would not comport with the spirit of the naturalization laws, to subject a certificate of naturalization to a technical or critical examination, when presented as evidence of citizenship. If it is granted by a court having jurisdiction, and by fair construction imports a substantial compliance with the requirements of the law, it must be deemed conclusive. The errors of the court, or its clerk, must not be visited on the man who reposes on it as his title to citizenship.

4 The Act of Congress of July 17, 1862, authorizes the naturalization of aliens who have been honorably discharged from the military service of the United States, on proof of one year's residence. 2 Brightly's Digest, 5. The certificate of naturalization obtained by the appellee was had under this act, as is expressed on its face. The facts entitling an alien to the benefit of this act are, that he is of the age of twenty-one

years, or more, has resided in the United States for more than one year previous to his application to become a citizen, that he had enlisted in, and been discharged honorably from the military service of the United States. He must, also, make proof of his good moral character, as required by previous laws. A comparison of the certificate of naturalization of the appellee with this statute, shows a substantial compliance with its requirements. It is urged that the statute requires the certificate to be granted on a petition of the alien, and it does not appear that the appellee presented to the court any petition. The certificate recites that the appellee appeared in open court, " and makes application to be admitted a citizen," &c. *Application*, we think, here, is synonymous with *petition ;* and, if it were not, that when the certificate is collaterally assailed, we must presume the application was by petition, if that presumption be necessary to support the certificate. In this particular statute, however, the words *application* and *petition* are used as having the same meaning. The statute first declares the alien shall be admitted to citizenship upon his *petition*, and then immediately declares, he shall not be required to prove more that one year's residence in the United States previous to his *application* to become a citizen, thus using the two words indifferently to express the same thing.

It is next urged, that it does not appear that the appellee had enlisted in, and been honorably discharged from the *military service* of the United States, and therefore the certificate must be deemed void. In the light of the rules we have already announced, and fairly construing the certificate, we cannot sustain this objection. This certificate recites, that it appeared to the satisfaction of the court, that the appellee was entitled to the benefit of the act of Congress we have referred to ; that he had resided in the United States for more than one year previous to the application ; that he had been honorably discharged from the service (omitting the word *military*) of the United States. When it is remembered that there is an express recital in the certificate, that the appellee is " entitled to the benefits of the act of Congress ; " that there is no other statute than the one of July, 1862, authorizing naturalization, on proof of one year's residence, and none authorizing naturalization because of a discharge from any other service than the military service, it would not be fair or reasonable to indulge any other supposition, than that by a mere clerical misprision the word *military* was omitted from the certificate. If the appellee had been discharged from the military service of the United States, he must have enlisted therein ; and the averment of his honorable discharge is an averment of his enlistment. The certificate is valid, conclusive of an observance of

the requirements of the law, entitling the appellee to citizenship, unless it can be collaterally assailed for fraud.

5. The statement avers the certificate of naturalization to have been obtained by a fraudulent misrepresentation, and a fraudulent suppression of facts material to the jurisdiction of the City Court, and material to the right of the appellee to naturalization. The certificate of naturalization recites that these facts were proved in the City Court, and they were of necessity involved in the adjudication pronounced by that court. If these facts are well pleaded in the statement, the demurrer was an admission of their truth. If not well pleaded, the demurrer presents only the question of their relevancy. They are not well pleaded unless they open an inquiry on which the court could, and was bound to enter. We do not intend a relaxation of the common law maxim, that fraud is odious, vitiating all that it taints. Contracts, without regard to their dignity; judgments, without respect to their solemnity, or the superiority of the jurisdiction rendering them, if infected by fraud, are, in the eye of the law, nullities. This is certainly true, and there is not, perhaps, in the law, a more difficult and delicate question, than to determine when a judgment, infected by fraud, can be collaterally impeached; no question more embarrassed by loose *dicta*, calculated to mislead. This case does not require us to engage in a discussion of that question.

Since the adoption of the present Constitution of the United States, the change from alienage to citizenship is, and has been, a matter of federal right and interest, rather than of state concern. An alien, naturalized, becomes entitled to all the privileges and immunities of the native born. The naturalization laws are conceived in a spirit of invitation to immigration, and inducement to the acquisition of citizenship, rather than to the relation of a residence without equality of right and privilege. A judgment admitting an alien to citizenship, has none of the properties or qualities of a judicial proceeding *in personam*. It is rather *in rem*. It simply ascertains and defines the *status* of the individual, and of itself and in itself works no public or private injury. It is designed to be the indisputable muniment of the title to citizenship. The alien must, and it is intended he should, confidently rely on its inviolability. If, whenever his right or duty as a citizen is involved in any of the courts of the United States, or of the several states, the judgment of naturalization can be assailed, and he be put on proof of all the facts proved, or which were involved when the judgment was rendered, its value and dignity is lessened; and that which our constitutions and laws teach him to regard as inestimable, would degenerate into a

[*Scott v.* Strobach.]

fruitful source of vexation and litigation. We must hold the certificate of naturalization free and exempt from all collateral impeachment, no matter though it is averred that fraud and perjury were involved and committed in its procurement.

We think we but follow the analogies, and are within the clearly defined principles of the law. If a decree of divorce is granted, it would scarcely be contended, that whenever the relation of the parties came in question collaterally and incidentally, that decree could be impeached for fraud, and an inquiry opened into the existence of the very facts on which it was founded; if she who was a wife sued as a *feme sole*, and her coverture was pleaded in bar or abatement, and she replied the decree of divorce, that then her adversary could rejoin the invalidity of the decree, and open again the very controversy which it was intended to silence. If a right is founded on the probate of a will, can the validity of that decree of probate be incidentally and collaterally assailed by all who oppose that right, and every tribunal, regardless of its relation to the jurisdiction granting the probate, be converted into a revisory court, and annul the judgment to which the law is supposed to impart sanctity? Suppose it is competent for a court now incidentally to enter on the inquiry the appellant propounds, what would be the force and effect of the judgment rendered? If favorable to the appellee, would it finally and conclusively define and declare his citizenship, so that it could never again be questioned? If adverse to him, would he be forever shorn of the high privileges and immunities the certificate confers? The endless uncertainty and confusion which must ensue from the recognition of a collateral and incidental impeachment of the certificate of naturalization, is a cogent argument. One court and jury declare that it is fair, another declares it is void. On one trial, particular evidence can be adduced; on another, it is wanting, or different evidence is given. The certificate of naturalization, though reciting the existence of every fact necessary to its validity, and the act, and under the seal of a court of competent jurisdiction, would be reduced to the level of a mere parol contract, if the proposition of appellant could be sustained. We hold that a certificate of naturalization, except in a direct proceeding for its revocation in the court granting it, is conclusive and unimpeachable. No allegations of fraud or perjury in its procurement can or will be collaterally entertained. *U. S.* v. *Bark Acorn,* 12 Int. Rev. Rec. 113; *McCarthy* v. *Marsh,* 1 Selden, 263; *Mason* v. *Messenger,* 17 Iowa, 261.

6. There remains but one question to determine. On the appeal from the judgment of the probate judge to the Circuit Court, the appellant, in whose favor the judgment was ren-

[Stewart *v.* Trenier.]

dered, moved for an affirmance, because the appellee had not assigned errors. The court overruled his motion, and permitted the appellee to interpose a motion to dimiss the statement filed before the probate judge; which motion was sustained. To these rulings the appellant reserved exceptions. If the case, when removed to the Circuit Court, was triable only on the record, there was error in these rulings. We are satisfied the Act of 1868, under which these proceedings were had, contemplated a trial *de novo* in the Circuit Court, and in the ruling of the Circuit Court there was, of consequence, no error. As the Act of 1868 has expired under the influence of recent legislation, a statement of the reasons leading us to this conclusion is not of practical importance, and would swell this opinion, already extended to an unusual length.

The judgment of the Circuit Court is affirmed.

SAFFOLD, J. — I think the acceptance of an office by one who at the time holds an incompatible office does not, *ipso facto*, vacate the first. It gives evidence of the intention of the incumbent to resign the first office, more or less strong, according to the evident or manifest incompatibility of the two. It furnishes ground to compel the officer to select which he will hold; and when the incompatibility is declared, he ought to be allowed the privilege of selection.

I prefer not to express an opinion now on the eligibility to office of one who is not a qualified elector.

With these exceptions, I concur fully in the opinion of the court.

PETERS, C. J. — I concur with my brother SAFFOLD in the above modification of the opinion therein referred to.