COBB, Judge.
Jeremy Shawn Bentley was convicted of murder during the course of a kidnapping, § 13A-5-40(a)(l), Ala.Code 1975, and murder during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975, for his participation in the killing of Jamie Tolbert. Bentley was sentenced to life imprisonment without parole. This appeal followed. We reverse and remand.
At issue in this case is whether the trial court had the authority, sua sponte and over repeated objections by the defense, to order a third mental health evaluation of Bentley when the State’s psychologist and the defense psychologist agreed that Bentley was incompetent and should be committed to the Department of Mental Health and Mental Retardation. Although this issue could have been presented with more detail, we nonetheless find that it was presented in Bentley’s brief to this Court, and it was addressed in the State’s responsive brief. Furthermore, the trial court’s refusal to accept the extensive evaluations and opinions presented by the State’s expert and the defense expert, and its decision to employ a third expert of its own choosing was a matter defense counsel objected to repeatedly at trial. There *353 fore, we find it appropriate and necessary to address the merits of the claim here.
The procedural history of this case is complex and fact-specific. It included a joint request by the prosecutor and defense counsel, early in the case, that the trial court accept Bentley’s plea of “not guilty by reason of mental disease or defect” and order his commitment to the Department of Mental Health and Mental Retardation on the ground that he presented a substantial risk of harm to himself and to others. Due to this unique procedural history, we will set forth in detail pertinent portions of that history.
The State’s evidence established that Bentley and his codefendant, Brent Ka-bat, abducted Jamie Tolbert from a nightclub and transported him to a rural area in Mobile County, where they killed him.[1] Bentley and Kabat took Tolbert’s vehicle; they were later apprehended in California. Bentley, according to all of the testimony presented before and during the trial, suffers from severe mental disorders, including psychosis and dissociative identity disorder (formerly known as multiple personality disorder), and he has been mentally ill for most of his life. Bentley’s odd behavior was apparent even to a layperson at the beginning of this legal proceeding. Detective Dale Kohn of the Mobile County Sheriffs Department interviewed Bentley after he was apprehended in California. He testified at a suppression hearing that Bentley initially walked into the interview room “kind of zombie-like,” that he did not acknowledge the detective’s presence, and that he walked slowly past the detective, staring at the ground. Bentley would not cooperate with the California authorities’ efforts to take his photograph, even when the authorities applied physical force. Moments later, when Kohn told Bentley that he had spoken with Brent Kabat about the crime, but that Bentley did not have to speak to him, Kohn said, “Mr. Bentley looked me in the face, like he’d come out of a coma and said, ‘I’ll talk to you.’ ”
Following Bentley’s indictment on capital-murder charges, defense counsel entered a plea of “not guilty by reason of insanity” and filed pretrial motions raising concerns about Bentley’s competency to waive his Miranda[2] rights before he made inculpatory statements, his competency to stand trial, and his competency at the time of the crime. Pursuant to Rule 11.2(c), Ala. R.Crim. P., defense counsel filed a written demand for a jury determination of his competency to stand trial. Bentley was evaluated by Dr. Marianne Rosenzweig, a clinical and forensic psychologist he retained. At the State’s request, the trial court ordered that Bentley be evaluated at Taylor Hardin Secure Medical Facility. Rule 11.3, Ala. R.Crim. P. Dr. Kathy Ronan, a certified forensic examiner and the director of evaluation/psychology services at Taylor Hardin, evaluated Bentley. After completing her initial evaluation, Dr. Ronan informed the court that she needed more time to observe Bentley and that treatment might be necessary for his psychiatric symptoms. The trial court allowed both. Bentley remained at Taylor Hardin for purposes of evaluation and treatment from July 25, 2001, until September 27, 2001. Drs. Ronan and Rosenzweig submitted extensive reports to the *354 attorneys and to the court regarding their findings that Bentley was incompetent.[3]
On December 6, 2001, the trial court held a hearing. At the beginning of the hearing, the following occurred:
“[PROSECUTOR]: Judge, [defense counsel] and I have looked at the law, and I believe the way it would work is at this point the State, based on the findings of the doctors, both of whom are here and would testify, would confess a finding of not guilty by reason of mental disease or defect.
“THE COURT: And which doctors are we referring to?
“[PROSECUTOR]: Dr. Ronan from the Alabama Taylor Hardin facility and Dr. Rosenzweig who is in private practice in Tuscaloosa.”
(12/6/01 hg., p. 4.)(Emphasis added.)[4]
The prosecutor continued:
“And upon that confession by the State, and if you accept that finding of not guilty by reason of insanity, based upon the reports or the testimony, if you feel like you need to take testimony first, that triggers, then, a commitment hearing wherein the State would introduce evidence to show that the Defendant presents a substantial 'risk of harm to himself and to others and, whereupon, if we meet that burden, it would then be on Your Honor to order him committed to the State Department of Mental Heath and Retardation until such time as he’s no longer a danger. We are prepared to proceed on all of those fronts today.”
(12/6/01 hg., pp. 4-5.)(Emphasis added.)
The prosecutor further stated:
“Judge, just as a matter of [an] offer of proof, I expéct that both the psychologist hired by the Defendant and the psychologist working for the State of Alabama will tell Your Honor that the Defendant is a substantial risk to himself and others to the point that it’s highly likely that if he was ordered released he would kill again. We are prepared to proceed with all of that testimony today, and we will be asking Your Honor — we drafted an order that tracks the standard order from Taylor Hardin, if you find that we have met the burden of showing that, that you would order him committed.”
(12/6/01 hg., pp. 5-6.)
The prosecutor informed the court that the parties had stipulated to the admission of the psychological reports completed by Drs. Ronan and Rosenzweig, in addition to Bentley’s “narratives,” the statements taken by Detective Kohn from Bentley and codefendant Rabat, and Kohn’s narrative. Defense counsel noted that Bentley’s statement to Detective Kohn was introduced for the limited purpose of the commitment hearing, and that the defense was not waiving its argument that Bentley was incompetent when he made the statement. The prosecutor then stated, “Judge, / think it’s pretty clear that based on the opinions of the doctors, that we would *355 have a hard time convincing Your Honor to let us use that statement at the guilt or innocence proceeding .... ” (12/6/01 hg., p. 7.)(Emphasis added.)
The State then called Dr. Rosenzweig, the mental health expert for the defense, to testify. Dr. Rosenzweig stated that she met with Bentley on seven occasions between May and September 2001, and spent approximately 20 hours with him. She conducted lengthy clinical interviews, administered psychological tests, read the volumes of material about Bentley that the attorneys had provided to her, and gathered information from collateral sources. She determined that Bentley was suffering from paranoid schizophrenia and dissociative identity disorder. She testified as to her conclusion that Bentley’s actions at the time of the killing were directly related to both of those diagnoses. She further testified that, since the age of 9 or 10, Bentley had a delusional belief system. She explained:
“[H]e has believed that he is one of seven people who are chosen — he does not know the other six people, but he believes that he is one of the seven people who are chosen for a special role in the end of the world. And he is .not certain which side he is on, either Satan’s or God’s side.
“He believes that he was programmed at birth to kill, and he told me that he believes that his actions against [the victim] were practice for his role in the end of the world where many innocent people would probably have to die and that he had to desensitize himself to killing innocent people.”
(12/6/01 hg, p. 13.)
Dr. Rosenzweig testified that Bentley “remains a very substantial risk to other people,” and she said that she had “considerable concerns about his potential for violence” against anyone, including staff members and inmates at any facility where he might be placed. Dr. Rosenzweig determined that Bentley’s prognosis was dismal, stating, “I would think that there’s not much likelihood that he would not pose a considerable risk to other people for the remainder of his life.” (12/6/01 hg, p. 15.) She recommended that he be committed.
The prosecutor then called Dr. Ronan to testify. Dr. Ronan stated that she is the director of psychology and evaluation services at Taylor Hardin Secure Medical Facility, where she had evaluated approximately 1,000 defendants on competency issues during her 14-year tenure at the facility. She diagnosed Bentley as suffering from dissociative identity disorder which, she testified, was formerly known as multiple personality disorder, and either schizophrenia or paranoid delusional disorder. She stated that Bentley had “required all kinds of extra services while he was in school to manage his behaviors, as well as psychiatric intervention beginning at a fairly young age.” (12/6/01 hg, p. 20.) Dr. Ronan also testified that Bentley had displayed violent tendencies and had “run-ins” with the police and that he had a history of suicide attempts. She also testified about Bentley’s long-standing delusion of being one of the chosen seven who would participate in the conflict that would end the world.
Dr. Ronan testified that in her private practice she specializes in treating patients who suffer from multiple personality disorder. She described the development of this disorder and its characteristics and she testified about how this disorder manifested in Bentley.
The prosecutor asked Dr. Ronan whether, if Bentley were released into society, he would kill again. She stated unequivocally that he would do so. She, too, testified that Bentley’s prognosis was poor and *356 recommended that he be committed to Taylor Hardin.
At the conclusion of the December 2001 hearing, the trial court did not rule on the joint motion of the State and the defense that Bentley’s insanity plea be accepted and that he be committed to Taylor Hardin. The trial court stated that it would review the documents and make a determination. ■ The court held another hearing on January 3, 2002. The court accurately summarized the procedural posture of the case, noting that the State was not contesting Bentley’s plea of not guilty by reason of mental disease or defect. The court then stated that it was not going to rule on the parties’ joint motion at that time and that it was going to order a third mental-health evaluation. The judge stated, “I’m not sure which doctor I’m going to request to do the evaluation-.. The Court is not satisfied based on the report from [Drs. Ronan and Rosenzweig] but I am going to order a third evaluation. We will try to order that as soon-as possible.” (1/3/02 hg., p. 4.)
When defense counsel pointed out to the judge that the defense expert and the State’s expert were in complete agreement, and that the State’s expert was the “highest person” in the State who conducted these forensic evaluations, the trial court stated, “I’m not convinced that the doctors completed a thorough review of the Defendant’s history.” (1/3/02 hg., p. 5.) The court further stated, “I do not believe that their findings' are based upon all the information that was readily available to them.” (Id.) Defense counsel- objected to a further evaluation, and the court agreed to have another hearing on the matter to consider any additional evidence.
On February 1, 2002, another hearing was held.[5] The trial court stated that, after considering the testimony of the experts who had testified at the December 6, 2001, hearing, it had rejected their recommendations and indicated it was going to “retain the services of another expert.” (2/1/02 hg., pp. 3-4.) The hearing was being held, the court said, so that defense counsel could examine the doctors “and get more specific.” , The court stated that the present hearing would allow the court an opportunity to question the experts, if the court chose to do so, “because once I— once I enter a final order in the case and order another evaluation, then I will put in writing my reasons -why.” (2/1/02 hg., p. 5.)
Dr. Ronan was again called to testify. She stated that during the course of her career she had conducted more than 1,000 forensic evaluations. She said she had found-a very low number of those defendants to be legally insane. Dr. Ronan testified that she had reached that conclusion- — that a defendant was so severely mentally ill that he lacked the ability to appreciate the wrongfulness of his actions — in only three or four capital cases and had testified as to that conclusion in only one case. As defense counsel began to question Dr. Ronan about her evaluation of Bentley, the trial judge stated that he had been satisfied with the information that had been presented at the previous hearing, but “heard very little testimony” about “any past specific acts of problems [sic] as it relates -to acting out things in violence or threats or acts toward people that would cause them a great deal of harm or harm himself.” (2/1/02 hg., pp. 13-14.) Dr. Ronan testified:
“But at this point, I would like to say that absolutely every piece of informa *357 tion that was available regarding this defendant’s prior criminal actions, prior aggressive actions from the time he was a very young child, claims, threats, hospitalizations for potentially suicidal behaviors, all of those things were explored and I’ll be more than happy to go into great detail about all of those issues.”
(2/1/02 hg., p. 15.)
The trial court stated that it wanted more information about Bentley’s history, to which defense counsel responded, “I think there’s a history with Mr. Bentley dating from the age of two forward .... ” (2/1/02 hg., p. 16.) The trial court said that it would review the information, although that information might not change its opinion. Dr. Ronan then testified that Bentley
“clearly has a history of being aggressive from the time he was a very young-child, and I spoke with his mother for three and a half hours on the phone about that. He, himself, is able to describe things that his mother had described about his actions when he was younger or at various points. I had hospital records I reviewed and police reports that I had reviewed about actions in the past that he had — that had been of a violent nature.”
(2/1/02 hg., p. 22.)
Dr. Ronan further testified about comments Bentley had made while he was hospitalized at Taylor Hardin regarding his past violence and his enjoyment of killing. Dr. Ronan said that she attempted on several occasions to question Bentley about these statements, but that, due to Bentley’s psychotic disorder and his dissociative disorder, he was unable to provide reliable information about the alleged prior killings. She further testified that she was “convinced” that Bentley was not malingering, in particular about the existence of the dissociative disorder, because he exhibited many of the nuances of a dissociative disorder that she had seen other patients exhibit in her years of specializing in treating such patients. Defense counsel inquired whether she was aware of anyone else in the State who specialized in or had more experience in dealing with patients with dissociative disorders, and Dr. Ronan replied, “There may be, but I’m not aware of them.” (2/1/02 hg., p. 26.)
Dr. Ronan testified that she was confident of her diagnosis, that the conditions from which Bentley suffered constituted severe mental diseases or defects, and that it was her opinion that, because of the mental diseases, Bentley could not appreciate the nature and quality or wrongfulness of his acts when he committed the offense. She again testified that her recommendation was that Bentley be committed to State custody and placed in Taylor Hardin Secure Medical Facility.
As to the thoroughness of her evaluation of Bentley, which was a concern expressed by the trial judge, Dr. Ronan testified as follows:
“I spent approximately 40 or 45 hours on this case, because of the bizarre nature of the case, and certainly, the severity of the crime and — I don’t always do that on every case — but on a case like this, yes, I have done this in the past and I was aware of no other piece of information that was out there that I had not had some kind of information about or been privy to, that’s why I felt confident in my opinions about the diagnosis. Plus, I was able to observe him and communicate with him over the course of two plus months in the hospital and interviewed him for, approximately, 25 hours.”
(2/1/02 hg., p. 23.)(Emphasis added.)
The trial court stated that it would review the data the experts had reviewed *358 and that it would reserve its ruling until it had done so. The trial court then explained that it wanted to see what information the experts had “concerning prior criminal activity or comments, I didn’t see a whole lot of that in that report and that’s my concern and that’s what I would like to get some additional information on.” (2/1/02 hg., pp. 31-32.)[6] • Dr. Rosenzweig then testified that people in dissociative states often have difficulty accurately reporting memories of prior activities, and their “recovered memories” may be inaccurate. She further stated that Bentley, because he suffers from a psychotic disorder and a dissociative disorder, “has a great deal of difficulty distinguishing between his dreams and reality and he does dream a lot about killing other people and having killed other people.” (2/1/02 hg., p. 35.) Dr. Rosenzweig testified that Bentley’s reports of past killings might not be accurate, “but at the same time, I do believe that he is very dangerous.... ” (Id.) Upon inquiry from the trial judge about whether it would be helpful to substantiate Bentley’s claims of prior violence, Dr. Rosenzweig said that, in terms of her evaluation of Bentley, it did not matter whether he had killed before. Her conclusions as to his mental incompetency would remain the same. That Bentley reported killings he had not committed was in keeping with his delusional belief system.
After hearing the testimony from the experts, the trial judge apologized because, at the previous hearing, he had been under the impression that the experts had not investigated allegations that Bentley had previously killed people or had sacrificed animals, and the experts had actually done so. The judge indicated that his difficulty with the case was that Bentley had stated that this behavior was not unusual for him and that it was part of his mission, but there was “no evidence that [he] participated in this mission in the past.” (2/1/02 hg., p. 45.) The judge further stated, “Well I think it’s fair to say that I have some concerns about his theory as to why he did what he did.” (2/1/02 hg., p. 46.) When defense counsel reminded the trial judge that records indicated that Bentley had talked about being part of this “mission” since he was 18 years old, the judge stated that he must have missed that information.
Defense counsel noted that “everybody is saying the same thing,” and that the State’s expert and the defense expert agreed as to Bentley’s diagnoses and his dismal prognosis. The trial court stated that the experts’ additional testimony had answered his question, but added, “[WJhether or not it changes my position is a different issue.” (2/1/02 hg., p. 49.) The court stated that it would issue a ruling in two weeks.
On June 25, 2002, the parties convened for a hearing regarding new motions for an evaluation to determine Bentley’s competency to stand trial. When defense counsel mentioned that the trial court had not yet ruled on the prior joint motion regarding Bentley’s competency at the time of the offense, the trial court stated, “Well, at this point I find him competent at the time he committed the offense.” (6/25/02 hg., p. 5.)(Emphasis added.) Upon inquiry from defense counsel, the trial court stated, “[B]ased on the evidence presented by the doctors and all the evidence presented to me, I find him competent. But that’s still an issue for the jury to decide.” (6/25/02 hg., p. 6.) The court then stated that it rejected the State’s recommendation that Bentley be found *359 “incompetent by mental disease or defect to go forward .... ” (6/25/02 hg., p. 7.)
On July 16, 2002, the trial court ordered an evaluation to determine Bentley’s competency to stand trial and his mental state at the time of the offense. The order specified that the evaluation was to be performed by a mental-health professional under contract with or employed by the Alabama Department of Mental Health and Mental Retardation. The order indicates that it was served on the parties and on Dr. Doug McKeown, a certified forensic examiner.[7] On July 22, 2002, the trial court amended the order to include an evaluation of Bentley’s competency to waive his Miranda rights. Dr. McKeown interviewed Bentley for approximately three and one-half hours at the Mobile jail. He also reviewed the extensive data and reports from Drs. Ronan and Rosenzweig, had a telephone conference “and direct consultation with the Honorable Judge [Herman] Thomas,” and consulted with the prosecutor and defense counsel. (C. 134.) He administered no psychological tests, but relied on the results obtained by Drs. Ronan and Rosenzweig. Dr. McKeown summarized his diagnoses of Bentley as follows:
“This examiner believes that there is a long history of psychological difficulties with indicators from childhood and adolescence related to conduct, attention and behavioral problems along with associated symptoms that would be consistent with, at that time, an emerging characterological disorder which now could present itself as a Personality Disorder [Not Otherwise Specified] with anti-social and borderline features. In addition to this, indicators suggestive of and consistent with a Dissociative Disorder do appear quite possible and consistent with the clinical presentation. A Psychotic Disorder with intermittent paranoid and delusional characteristics appears as a third particular psychological entity impacting this gentleman.”
(C. 138.)
Notwithstanding those diagnoses and all of the facts reported above, Dr. McKeown determined that Bentley was competent to stand trial, was competent to waive his Miranda rights, and was competent at the time of the crime. As to the final determination, Dr. McKeown stated in his report:
“While significant clinical issues appear to exist, this examiner believes that there is no substantial base of information that would allow an interpretation of his actions and behavior in such a fashion as in any state (dissociative or based on delusional beliefs) he would not be accountable for his actions and behavior and incapable of appreciating the wrongfulness of his behavior and actions.”
(C. 140.)(Emphasis added.)
The matter proceeded to trial and Dr. Ronan, Dr. Rosenzweig, and Dr. McKeown testified as to their findings. The jury determined, initially, that Bentley was competent to stand trial. At the subsequent trial on the merits, the jury rejected Bentley’s claim that he was not guilty by reason of mental disease or defect and found him guilty of capital murder.
We have quoted extensively from the record in this case to demonstrate two things: first, that the trial judge exceeded his authority when he ordered the third evaluation; and second, that even if the trial court had been vested with the authority to order a third evaluation, and he *360 was not, under the extraordinary facts of this case that order would have constituted reversible error.
Rule 11, Ala. R.Crim. P., governs the procedures to be followed when a defendant’s mental competency is questioned. Rule 11.2(a)(1) provides that a defendant’s present mental condition and his competency to stand trial can be evaluated upon motion of the defendant, defense counsel, or the prosecutor. That rule provides that the trial court can order on its own motion an examination of present competency and competency to stand trial. Rule 11.2(c) provides that the defendant has the right to a jury at a subsequent hearing on his competency to stand trial, and he can preserve that right by filing a written demand for a jury. Rule 11.2(a)(2) provides that, if a defendant raises a timely plea of “not guilty by reason of mental disease or defect,” the court may order an examination of the defendant’s mental state at the time of the offense, either on its own motion or on a motion filed by the defendant, defense counsel, or the prosecutor.
Rule 11.3(a) provides:
“If the circuit court determines that reasonable grounds for an examination exist, it shall either appoint a psychiatrist or psychologist to examine the defendant and to testify regarding the defendant’s mental condition, or order that an examination be conducted by a psychiatrist or psychologist appointed by the commissioner of the Department of Mental Health and Mental Retardation.”
After the psychological or psychiatric examinations have been conducted and the experts have submitted their reports to the circuit court, the judge sets a hearing if there are reasonable grounds to doubt the defendant’s competency to stand trial. Rule 11.6, Ala. R.Crim. P.
Rule 11 permits the trial court to order additional examinations in certain circumstances:
“(d) Additional Expert Assistance. The circuit court may, in its discretion, appoint additional experts and may order the defendant to submit to physical, neurological, or psychological examinations, when the court is advised by the examining psychologist or psychiatrist that such examinations are necessary for an adequate determination of the defendant’s mental condition.”
Rule 11.3(d), Ala. R.Crim. P. (Emphasis added.)
Application of the foregoing rules to the facts of this case demonstrates that the trial court erred when it ordered the third psychological evaluation and appointed Dr. McKeown to the case; because it had no legal authority to do so. Under the authority granted by Rule 11.2(a), the trial court ordered the evaluation of Bentley by the Department of Mental Health and Retardation. Pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the court granted Bentley’s request for funds to hire a psychological expert. The State’s expert, Dr. Ronan, and the defense expert, Dr. Rosenzweig, completed their evaluations; they agreed that Bentley was incompetent in all areas examined and that he should be committed to the Department of Mental Health and Retardation. Based on the experts’ findings, the prosecutor “confess[ed] a finding of not guilty by reason of mental disease or defect” and, along with defense counsel, sought to prove that Bentley presented a substantial risk of harm to himself and to others and should be committed. Given this set of circumstances, the trial court did not have the authority to order a third evaluation.
Rule 11.3(d), Ala. R.Crim. P., provides for the appointment of additional experts *361 “when the court is advised by the examining psychologist or psychiatrist that such examinations are necessary for the adequate determination of the defendant’s mental condition.” (Emphasis added.) As defense counsel repeatedly pointed out to the judge during the course of these proceedings, the State’s own expert determined that Bentley was incompetent and that he should be committed. Dr. Ronan testified to this repeatedly. Furthermore, as demonstrated above in the quotations from her testimony, Dr. Ronan had no doubts about the accuracy of her diagnoses because she examined every piece of information that was available and because her particular field of expertise was treating patients with dissociative disorders. The thorough reports and testimony made it clear that Drs. Ronan and Rosenzweig did not believe that additional expert evaluation was necessary. Because the court was not advised by the examining psychologists that any additional examinations were “necessary for the adequate determination of the defendant’s mental condition,” the court was without authority to order the third evaluation conducted by Dr. McKeown.
The trial court was presented with a joint motion and extensive testimony in support of that motion, seeking acceptance of Bentley’s plea of not guilty by reason of mental disease or defect. The trial court had the option to grant or deny that motion based on the evidence presented in support of that motion. It had no option, by rule or caselaw, to do anything else at that time. Rule 11 provides a trial court with discretion to order additional evaluations, but that discretion is triggered only by the request of the examining psychologist or psychiatrist.[8]
The trial court’s reasons for ordering Bentley’s examination by Dr. McKeown are unclear. Although the trial judge initially expressed concerns about what he believed to be Drs. Ronan’s and Rosenzweig’s insufficient investigation into Bentley’s prior acts of aggression and violence, the judge stated at the February 1, 2002, hearing, that he was satisfied that the experts had, indeed, investigated those reports. In fact, the extensive reports submitted by Drs. Ronan and Rosenzweig detail many incidences of prior aggression by Bentley. Given the extraordinary amount of time Dr. Ronan spent evaluating Bentley during his hospitalization at the facility where she is the director of psychology and evaluation services and given the vast detail in her report and in her testimony at the two hearings, as well as in the reports and testimony of Dr. Rosenzweig, we are unable to discern how the trial court could have had any concerns whatsoever about the thoroughness or quality of the evaluations completed by the experts in this case. This is especially true given the fact that the prosecution was willing to accept Bentley’s plea of not guilty by reason of mental disease or defect, and that the prosecution presented the testimony of its expert and the defense expert in support of the joint motion to have Bentley committed to State custody.
Because Dr. McKeown’s testimony as to this third, unlawfully ordered, evaluation was presented to the jury at the competency hearing,[9] the judgment in this *362 cause must be reversed and the cause remanded. Dr. McKeown’s testimony should not have been presented to the competency jury, and the error cannot be considered harmless. Without question, Bentley was seriously prejudiced by the presentation of Dr. McKeown’s testimony and findings. Dr. McKeown testified that Bentley was competent to stand trial and to waive his Miranda rights, and that he was competent at the time of the crime. All of those findings were in direct conflict with the detailed findings and opinions of Drs. Ronan and Rosenzweig. It is only through the introduction of Dr. McKeown’s testimony that this matter proceeded to a trial at all, because the other experts were in complete agreement that Bentley was not competent. Without Dr. McKeown’s testimony, the jury would have had no basis for finding Bentley competent. With Dr. McKeown’s testimony, however, a conflict existed among the experts, and the jury was provided with a basis for determining that Bentley was competent. The trial court’s actions created error that cannot be deemed harmless. Bentley is entitled to a reversal.
Even if the trial court had the authority to order an additional evaluation, which it did not, such an order in this case would have been reversible error. As detailed in the preceding portions of this opinion, the prosecutor was prepared to accept Bentley’s plea of not guilty by reason of mental disease or defect, based on the evaluation of its own expert. The prosecutor acknowledged that Bentley’s confession would not likely be admissible if a trial were held, due to the experts’ findings regarding Bentley’s mental incompetence. As the testimony clearly demonstrates, both experts were highly confident of their diagnoses of Bentley’s extreme mental illness, and testified that his prognosis was very poor. There was no disagreement between the results obtained by the State’s expert and the defense expert.
Although the court expressed some initial concerns that were based, apparently, on its lack of familiarity with the extensive information included in the psychological reports, at the conclusion of a second hearing, the court indicated that its questions about Bentley’s prior violence had been answered. To the extent the trial court ordered the third evaluation because it had concerns about Bentley’s theory of defense, those concerns were matters for a jury at the guilt phase of a trial, if that phase were ever to be reached in this case. Those concerns in no way justified a third evaluation of Bentley’s mental state in this case. Because of the unique circumstances of this case, we would be compelled to find that, even if the trial court had the authority to order an additional evaluation without the express advice by the examining psychologists that an additional evaluation was necessary, that order would have been erroneous.
Because the trial court lacked the authority to order the evaluation by Dr. McKeown, and because Dr. McKeown’s prejudicial testimony and findings were admitted at the competency hearing and again at trial, the only just result in this case is a reversal.
Reversal of Bentley’s convictions provides an opportunity for the State to pursue its original course of action — confessing that Bentley is not guilty by reason of mental disease or defect and pursuing commitment of Bentley to the Department of Mental Health and Mental Retardation. If, however, the case is again prosecuted on capital-murder charges, and if a competency hearing is held, Dr. McKeown’s testimony cannot be presented at the competency hearing or at a subsequent trial, if one is held.
*363 The record in this case presents one of the most disturbing portraits of mental illness in a criminal defendant that can be imagined. The testimony of two rightfully appointed experts in this case unequivocally established that justice demanded that Bentley be removed to a secure mental health facility so that he could receive treatment and so that he would be unable to harm himself or others.
For all of the foregoing reasons, we reverse Bentley’s convictions and sentences and remand the cause for further proceedings.
REVERSED AND REMANDED.
McMILLAN, P.J., concurs.
WISE, J., concurs in the result.
BASCHAB and SHAW, JJ., dissent, with opinions.

. Kabat was also convicted of two counts of capital murder. This Court affirmed Rabat’s convictions and his sentences of life imprisonment without parole. Kabat v. State, 867 So.2d 1153 (Ala.Crim.App.2003).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Dr. Ronan’s report consisted of 37 single-spaced pages. The report detailed her clinical assessment based on interviews and record review, and her observations and results of the extensive psychological evaluation that • occurred during Bentley's two-month admission at Taylor Hardin Secure Medical Facility. Dr. Rosenzweig’s initial and supplemental reports consisted of 18 single-spaced pages. Her reports detailed findings based on her 12 hours of interviews with Bentley, on the testing she conducted, on the review of records, and on interviews with collateral sources.

. The transcripts from each hearing in this case are numbered separately, so the date of the hearing is provided to identify the source of the material cited.

. The transcript of this hearing is contained in a supplemental volume of the record on appeal.

. Contrary to the court’s assertions, Dr. Ro-nan’s report is replete with details of Bentley's previous acts of verbal and physical aggression.

. In his testimony before the jury at the competency hearing, Dr. McKeown stated that he was not under contract with the Taylor Hardin Secure Medical Facility when he performed the evaluation.

. We disagree with Judge Shaw's characterization of our holding in his dissent. The holding is not simply that, after the initial evaluations had been completed, the trial court had the option to grant or to deny Bentley’s motion for judgment of acquittal. Our holding is that the trial court did not have the authority, under Rule 11 or any other law, to order another mental evaluation.

. Dr. McKeown’s testimony was presented again at trial.