MOORE, Chief Justice
(dissenting).
The Alabama Department of Mental Health (“ADMH”) petitions this Court for a writ of mandamus directing the Mobile Circuit Court (“the trial court”) to vacate portions of its order denying ADMH’s Rule 25.8(f), Ala. R.Crim. P., motion to release Jeremy Bentley from commitment in an ADMH facility and transferring Bentley to an Alabama Department of Corrections (“ADOC”) facility.
The Court today denies ADMH’s petition for a writ of mandamus. For the reasons discussed below, I dissent.
I. Facts and Procedural History On April 16, 2012, the trial court denied ADMH’s motion to release Bentley from commitment. The trial court’s order summarizes the facts and procedural history of the case:
“On November 14, 2000, Jeremy Bentley (‘Bentley’) was charged with murder during the course of a kidnapping and murder during the course of a robbery in connection with the killing of Jamie Ray Tolbert. Evidence presented by the State at trial established that Bentley and his codefendant, Brent Kabat, abducted Tolbert in his own vehicle from a nightclub in Biloxi, Mississippi. Bentley and Kabat drove Tolbert to a rural area in Mobile County, where they killed him. The two then continued traveling in Tolbert’s vehicle and were later apprehended in California. Kabat was also charged with, and later convicted of, two counts of capital murder, and he was sentenced to life imprisonment without parole.
“Following Bentley’s indictment on capital-murder charges, Bentley entered a plea of ‘not guilty by reason of insanity’ and filed pretrial motions raising concerns about his competency to waive his Miranda rights before making inculpa-tory statements, his competency to stand trial, and his competency at the time of the crime. Bentley retained Dr. Marianne Rosenzweig, Ph.D., a clinical *414 and forensic psychologist, to evaluate his competency. The State also sought to have an expert evaluate Bentley’s competency, and the trial court granted the State’s request that Bentley be evaluated at [ADMH’s] Taylor Hardin Secure Medical facility (‘Taylor Hardin’) in Tuscaloosa. There, Bentley was evaluated by Dr. Kathleen Ronan, Ph.D., a certified forensic examiner and then director of the hospital’s evaluation/psychology services. Bentley remained at Taylor Hardin for the purposes of evaluation and treatment from July 25 until September 27, 2001.
“Drs. Ronan and Rosenzweig both submitted reports finding Bentley incompetent. Dr. Rosenzweig determined that Bentley was suffering from paranoid schizophrenia and dissociative identity disorder (formerly known as ‘multiple personality disorder’) and that both of these disorders contributed to Bentley’s actions in the killing of Tolbert. Dr. Ronan diagnosed Bentley as suffering from dissociative identity disorder and either schizophrenia or paranoid delusional disorder. Both psychologists testified that Bentley was, and was likely to remain, a substantial risk to others.
“Based on the reports and testimony of Drs. Rosenzweig and Ronan, the State and Bentley filed a joint motion asking that Bentley’s insanity plea be accepted and that he be committed to Taylor Hardin. However, the trial judge was not convinced and he rejected this recommendation. Instead, the trial judge ordered that Bentley be evaluated by a third forensic examiner, Dr. Doug McKeown. Dr. MeKeown determined that Bentley was competent at the time of the crime, was competent to waive his Miranda rights, and was competent to stand trial.
“The trial court determined there were reasonable grounds to doubt [Bentley’s] mental competency. Thereafter, on October 31, 2002, a trial commenced with the jury first charged to determine whether Bentley was competent to stand trial. Drs. Rosenzweig, Ronan, and McKeown all testified as to their respective findings. After hearing the testimony, the jury determined that Bentley was competent to stand trial. The trial then proceeded on the merits and, on November 7, 2002, the jury rejected Bentley’s defense of not guilty by reason of mental disease or defect and found him guilty of two counts of capital murder. Based on these verdicts, the trial judge adjudged Bentley guilty and sentenced him to life imprisonment without parole.
“However, in a 3-2 decision, the Alabama Court of Criminal Appeals reversed Bentley’s convictions and sentences. See Bentley v. State, 904 So.2d 351 (2004), cert. denied, 904 So.2d 365 (Ala.2005). Although the trial judge— and later the jury — had the opportunity to observe Bentley as well as the testimony of the mental health experts, the appellate court found that the trial judge exceeded his authority and erred by ordering, and allowing the admission of, the third mental evaluation, i.e., McKeown’s evaluation that Bentley suffered no mental illness. Id. at 360-63. Speaking for the majority, [Judge] Cobb stated: ‘The record in this case presents one of the most disturbing portraits of mental illness in a criminal defendant that can be imagined.’ Id. at 363.
“The Court of Criminal Appeals remanded the case for further proceedings, but the court specifically prohibited any use of Dr. McKeown’s testimony that Bentley was not suffering from mental disease or defect. Consequently, on remand, the trial court entered judgment finding Bentley not guilty by rea *415 son of mental disease or defect on all counts, and the court committed him to the custody of Taylor Hardin.[1]
“On November 9, 2011, [ADMH] filed a ‘Notice of Proposal for Release’ asking this [c]ourt to release Bentley from Taylor Hardin, stating that Bentley ‘has received the maximum benefit of treatment from [ADMH] and it is the opinion of the professionals of [ADMH] that [Bentley] is showing no signs or symptoms of a mental illness and has no mental disorder for which any appropriate treatment is available in a [ADMH] facility.’
“In fact, during the two-day hearing in this matter, [ADMH] admitted that from the time Bentley arrived at Taylor Hardin in February of 2005, its medical providers have believed that he has been faking mental illness. [ADMH] acknowledged that as soon as Bentley learned he could not be re-tried for the capital murder of Jamie Tolbert, he dropped all pretense of suffering from mental illness. The records reflect that Bentley admitted that he had been faking mental illness all along, and it is clear [ADMH] staff members and medical providers believe his admission. [ADMH] believes that Bentley is simply a cold-blooded psychopath, and while Bentley is extremely dangerous and likely to kill again, he does not suffer from a treatable mental illness. Thus, [ADMH] contends that the [c]ourt has no choice but to grant [ADMH’s] request to release Bentley into society as a free man.
[[Image here]]
“ Bentley has been in the custody of [ADMH] since then, except for a period of time after Bentley assaulted a Taylor Hardin police officer and another patient. The officer filed charges, and Bentley was arrested, charged with two counts of assault, and held in Tuscaloosa County Jail. In May 2010, Bentley pled guilty to both counts and served several months in a state penitentiary.”
The trial court then summarized the testimony of the expert witnesses that was presented at the hearing on ADMH’s motion to release Bentley. The order also sets forth the applicable law. The trial court then concluded:
“[ADMH] and the State are certainly in agreement on one thing: Jeremy Bentley is an extremely dangerous man. Apparently, the question is not so much whether Bentley is likely to kill again, but rather “who will be the next victim?’ The real point of contention between the parties centers on why that is so.
“[ADMH] believes, and has for a long time, that Bentley faked mental illness and that his violent behavior and dangerous proclivities are simply the byproduct of Bentley’s psychopathic personality. [ADMH’s] official diagnosis of Bentley is that he has a ‘personality disorder not otherwise specified,’ with components of antisocial personality disorder and borderline personality disorder. By all accounts, antisocial personality disorder (a/k/a psychopathic personality disorder) is, like the other personality disorders, not treatable and not classified as a mental illness.
“It may come as a surprise to the general public, as it did to the undersigned, that persons with psychopathic personality disorders are not considered mentally ill. But that is just ‘who they are,’ and a typical psychopath is intelligent, calculating and cunning. Many, if not most, serial killers are diagnosed as having a psychopathic personality disorder. The mentality of a serial killer, while grossly disturbed, is not the result of a treatable mental illness; rather, such psychopaths are simply people with *416 deeply flawed characters who have no empathy or morals.
“The State agrees that Bentley presents as having an antisocial or psychopathic personality disorder, but the State’s experts believe that Bentley suffers from dissociative identity disorder (formerly] known as multiple personality disorder) and that only one of Bentley’s many personalities (or ‘alters’) has a psychopathic personality disorder. According to the State’s experts, some of Bentley’s other alters suffer from psychotic disorders (which are serious mental illnesses), but Bentley’s alter with a psychopathic personality disorder is the dominant alter at this time. By all accounts, dissociative identity disorder is classified as a serious and treatable mental illness.
“Under the law, if [ADMH] is correct and Bentley is simply a psychopath (even one who desires to commit many future murders), this [c]ourt is obligated to order his release into society. If the State is correct and Bentley suffers from dissociative identity disorder (and only one of his multiple identities is a psychopath), then Bentley must remain institutionalized and be treated for his mental illness.
“The [c]ourt considered the testimony of all the witnesses along with the voluminous records placed into evidence by the parties. The witnesses presented by both parties were highly qualified and well prepared. However, after observing the demeanor and testimony of all of the witnesses, the [c]ourt finds the testimony that Bentley suffers from dissociative identity disorder to be the most credible and persuasive. The records placed into evidence also support that finding. Therefore, [ADMH’s] application for Bentley’s release is due to be denied.
“The Court is not unsympathetic to the plight of [ADMH], which is charged with treating a person whose current and dominant alter is that of a psychopath. The records show that Bentley is terrorizing not only other patients but also the staff at Taylor Hardin. [ADMH] is concerned, and rightly so, for the safety of its staff and other patients if forced to continue treating Bentley at Taylor Hardin, and it is not surprising that [ADMH] seeks to have Bentley released from its facility. It is apparent that Taylor Hardin is ill equipped to handle a patient like Bentley. Most mentally ill patients are nonviolent and a mental health institution like Taylor Hardin is not designed or staffed to properly protect its patients and staff from a psychopath within its walls.
“In addition to the safety concerns associated with treating Bentley at Taylor Hardin, the undisputed testimony at the hearing indicated that Taylor Hardin does not currently have the expertise to treat patients with dissociative identity disorder. That mental illness requires highly specialized treatment over the course of many years, and it is possible for a dissociative identity disorder to never be cured. The only medical provider in Aabama who currently accepts patients for treatment of dissociative identity disorder is Dr. Ronan, who no longer works for [ADMH]. Accordingly, [ADMH] will have to contract with Dr. Ronan (or a medical provider who treats dissociative identity disorder) to provide treatment for Bentley.
“It is therefore ordered, adjudged and decreed:
“(1) [ADMH’s] application for Bentley’s release is denied,
“(2) in order to ensure the safety of the staff and other patients at Taylor
*417 Hardin, [ADMH] is ordered to transfer Bentley to a secure facility operated by [ADOC] where Bentley is to receive treatment for dissociative identity disorder until Bentley is cured of said mental illness, if ever,
“(3) until the transfer to [ADOC] is accomplished, [ADMH] is to keep Bentley in forensic restriction,
“(4) [ADMH] must contract with Dr. Ronan (or a medical provider who treats dissociative identity disorder) to provide treatment for Bentley. If [ADMH] later hires or trains staff with the expertise to treat dissociative identity disorder, then [ADMH] may use its own qualified personnel to treat Bentley at [ADOC’s] facility,
“(5) [ADMH] is directed to notify [ADOC] that Bentley’s alter with a psychopathic personality disorder is the dominant alter at this time, that this particular alter could remain dominant for many years, and that while Bentley is presenting with this particular alter he is to be viewed and handled as a very dangerous person, and
“(6) [ADOC] is ordered to accept the transfer of Bentley into one of its secure facilities capable both of dealing with a very dangerous person and allowing a mental health professional to treat Bentley.”
After the trial court denied ADMH’s motion to release Bentley, ADMH filed a motion to alter, amend, or vacate the trial court’s judgment, which the trial court denied on April 18, 2012. The trial court thereafter stayed enforcement of its judgment in order that ADMH might seek appellate review.
ADMH petitioned the Court of Criminal Appeals for a writ of mandamus directing the trial court to vacate the April 16, 2012, judgment. The Court of Criminal Appeals issued a unanimous order granting ADMH’s petition in part on September 6, 2012. See State v. Bentley (No. CR-11-1386, Sept. 6, 2012), — So.3d-(Ala. Crim.App.2012) (table). That order reads, in part:
“First, [ADMH] argues that there is no basis in law for the circuit court to transfer Bentley to [A]DOC. The respondent asserts that Rule 26.6, Ala. R.Crim. P., allows a court to place a defendant in some ‘other public facility,’ which would include [A]DOC. The Alabama Supreme Court in Ex parte Alabama Department of Mental Health and Mental Retardation, 18 So.3d 356 (Ala. 2009), stated:
“ ‘No definition of “other public facility” is provided in Rule 25 or in Title 15, Chapter 16, of the Alabama Code 1975. However, § 1 of Act No. 1220, Ala. Acts 1975, which authorized [ADMH] to establish the institution now known as Taylor Hardin, specifically provides that the institution authorized thereunder is “under the jurisdiction of’ [ADMH]. Accordingly, we hold that, because it is under the jurisdiction of [ADMH], Taylor Hardin is not an “other public facility” under Rule 25, Ala. R.Crim. P. Thus, under Rule 25.6(b) and § 15-16-43, Judge Bahakel was not authorized to commit McBride directly to Taylor Hardin rather than to the custody of [ADMH].’
“18 So.3d at 361. [A]DOC is not under the jurisdiction of [ADMH]; therefore, it appears that [A]DOC would classify as an ‘other public facility’ under Rule 25, Ala. R.Crim. P.
“Second, [ADMH] argues that there is no law that allows the court to fashion the treatment method for any individual under its custody and that for the court to do so violates the Separation of Powers Doctrine.
*418 “The Alabama Supreme Court in Ex parte Department of Mental Health, 511 So.2d 181 (Ala.1987), considered the validity of an order directing that a child be committed to [ADMH] and placed in a private psychiatric facility with the costs borne by [ADMH]. The Supreme Court, in setting aside the court’s order, stated: ‘[ADMH] is therefore charged by the Legislature to accept minors alleged to be mentally ill and treat them by means of its various programs and facilities. Nowhere in any of these statutes does the Legislature state that anyone other than [ADMH] is authorized to care for and treat these children.’ 511 So.2d at 183. See also Alabama Dep’t of Mental Health & Mental Retardation v. Andres, 515 So.2d 9, 12 (Ala.Civ.App. 1987) (‘That part of the court’s order proscribing [ADMH’s] discretion in formulating a plan for the child’s treatment and placement is reversed and remanded for entry of a judgment consistent with this opinion.’).
“The same is true in this case. Section 22-50-9, Ala.Code 1975, specifically states: ‘[ADMH] through its commissioner is hereby authorized to act in any prudent way to provide mental health services and mental retardation services for the people of Alabama.’ See also § 22-50-11(2), Ala.Code 1975. This court can locate no law that allows a circuit court to dictate a treatment regimen for any individual that [ADMH] is charged with treating. Accordingly, this petition for a writ of mandamus is granted in part. Judge Youngpeter is directed to set aside those portions of his order— sections numbered 3 and 4 — that dictate a specific treatment regimen and the personnel that must be supplied by [ADMH] to treat Bentley’s mental illness.”

II. Standard of Review

“A writ of mandamus is an extraordinary remedy, and is appropriate when the petitioner can show (1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.”
Ex parte Alabama Department of Mental Health & Mental Retardation, 18 So.3d 356, 358 (Ala.2009).

III. Analysis

A. A Clear Legal Right and an Imperative Duty

In order for mandamus to lie, ADMH must have a clear legal right to the relief sought, and the trial court, as respondent, must have an imperative duty to perform, i.e., to grant the relief. Ex parte Alabama Dep’t of Mental Health, 18 So.3d at 358. ADMH’s legal rights and duties are set forth in the Code of Alabama 1975. ADMH is “authorized to supervise, coordinate and establish standards for all operations and activities of the state related to ... the providing of mental health services.” § 22-50-11(2), Ala.Code 1975 (emphasis added). ADMH has the duty to “promulgate ... reasonable minimum standards for the admission, diagnosis, care, treatment, [and] transfer of patients or clients and their records.” § 22-50-11(11), Ala.Code 1975 (emphasis added). ADMH also has oversight over all State facilities providing mental-health treatment. § 22-50-11(12), Ala.Code 1975 (emphasis added). ADMH “may file and prosecute civil actions ... to enforce this article and such rules and regulations as may be promulgated under authority of that article,” § 22-50-11(16), Ala.Code 1975, and “such civil actions may include actions for an injunction to restrain any *419 organization from violating ... any [ADMH] rule or regulation.” Id.
Thus, Alabama law gives ADMH a right to intervene in the court-ordered transfer of an ADMH mental patient where the transfer would violate ADMH’s minimum standards for the care, treatment, and transfer of the patient. The trial court, moreover, would have an imperative duty to perform: i.e., to uphold ADMH’s rules and regulations.
B. Whether Bentley May he Transferred from ADMH to ADOC ADMH petitioned this Court for a writ of mandamus directing the trial court to vacate that portion of the its April 16, 2012, order that would effect Bentley’s transfer from an ADMH facility to an ADOC facility. ADMH argued that it “has a clear legal right to the relief sought because there is no basis in law for the trial court to order [ADMH] to transfer Bentley to [ADOC].” The Alabama Rules of Criminal Procedure provide:
“If, at the hearing held pursuant to Rule 25.3, the court finds that the defendant is mentally ill and as a consequence of such mental illness poses a real and present threat of substantial harm to himself or to others, the court shall order the defendant committed to the custody of the commissioner or to such other public facility as the court may order.”
Rule 25.6(b), Ala. R.Crim. P. (emphasis added).
ADMH acknowledges that Rule 25 does not define “other public facility,” but it maintains that the term clearly does not include an ADOC facility. ADMH maintains that Alabama law does not entrust ADOC with responsibilities that are not penal or corrective in nature. ADMH cites § 14-1-1.2, Ala.Code 1975, which states that ADOC is “responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout this state.” ADMH also argues that the trial court has no authority to “sentence” Bentley to further commitment in an ADOC facility, because he has not been found guilty or convicted of the charges against him.
In order to define “other public facility” in Rule 25.6(b), we must apply the rules of statutory construction.
“ ‘[T]his Court is to ascertain and effectuate the legislative intent as expressed in the statute. In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses, and words are given their plain and usual meaning. Moreover, just as statutes dealing with the same subject are in pari materia and should be construed together, parts of the same statute are in pari materia and each part is entitled to equal weight.’ ”
Lambert v. Wilcox Cnty. Comm’n, 628 So.2d 727, 729 (Ala.1993) (quoting Darks Dairy, Inc. v. Alabama Dairy Comm’n, 367 So.2d 1378, 1380-81 (Ala.1979) (citations omitted)). Although Rule 25 does not define “other public facility,” the rule does reference other “facilities.” Rule 25 defines a “[r]egional or community mental health facility ” as “any mental health facility providing mental health services pursuant to Ala.Code 1975, §§ 22-51-1 through 22-51-14.” Rule 25.1(f), Ala. R.Crim. P. (emphasis added). Rule 25.8 refers multiple times to “regional or community mental health facilities].” Rule 25.8(b); (c); (g)(l)-(3), Ala. R.Crim. P. Section 22-51-2, Aa. Code 1975, provides that persons may form a mental-health facility as a public corporation “to contract with the State Board of Health or [ADMH] in constructing and operating facilities” in the State. Alabama’s regional mental-health facilities provide inpatient care, diagnosis, *420 evaluation, rehabilitation, residential care, and services aimed at preventing “all forms of mental ... illness.” § 22-51-1 (d), Ala.Code 1975.
In addition, Rule 25.2(b), Ala. R.Crim. P., refers to “an appropriate mental health facility,” “such other public facility,” and custody in a facility under the jurisdiction of ADMH. The various references to “other public facility,” “appropriate mental health facility,” and “regional or community mental health facility” in Rule 25 all deal with the central subject of Rule 25: the commitment of those found not guilty by reason of a mental disease or defect. In contrast, Rule 25 never mentions “penal and corrections institutions,” as described in § 14-1-1.2, Ala.Code 1975. Applying the fundamental rules of statutory construction, I would conclude that “other public facility” must mean either a “regional or community mental health facility” or an “appropriate mental health facility,” but not an ADOC facility.
However, the Court of Criminal Appeals held that because “[A]DOC is not under the jurisdiction of [ADMH], ... it appears that [A]DOC would classify as an ‘other public facility’ under Rule 25, Ala. R.Crim. P.” (Citing Ex parte Alabama Dep’t of Mental Health & Mental Retardation, 18 So.3d 356, 361 (Ala.2009).) In Ex parte Alabama Dep’t of Mental Health, this Court considered whether Taylor Hardin Secure Medical Facility was an “other public facility” contemplated by Rule 25.6, Ala. R.Crim. P. 18 So.3d at 360. ADMH argued that because Taylor Hardin exists as an ADMH facility, it could not be an “other public facility.” Id. at 361. We agreed and held that “because it is under the jurisdiction of [ADMH], Taylor Hardin is not an ‘other public facility’ under Rule 25.” Id. (emphasis added).
Thus, in Ex parte Alabama Department of Mental Health, this Court dealt with the question of what is not an “other public facility.” Here, we are faced with the question of what is an “other public facility” under Rule 25. It is not sufficient under Rule 25 to show that a public facility is “not under the jurisdiction of ADMH” to classify that facility as an “other public facility.” There are many “public facilities” in Alabama that are not under the jurisdiction of ADMH. However, the trial court likely would not commit Bentley to those “other public facilities.”
Rather, any “other public facility” must serve the purpose of “the involuntary commitment of those who are found not guilty by reason of mental disease or defect,” which is the overarching topic of Rule 25. ADMH is authorized to “provide mental health services and mental retardation services for the people of Alabama.” § 22-50-9. A “[Regional or community mental health facility” also provides such services. In contrast, ADOC operates “penal and corrections institutions,” as described in § 14-1-1.2, facilities that are not designed for the commitment and rehabilitation of those found not guilty of a crime by reason of mental disease or defect. In fact, if Bentley indeed was a convict, both ADOC and the governor would have a statutory duty to remove Bentley from any ADOC facility: “The names of all convicts who ... have become insane must be forthwith reported ... to the Board of Corrections, which shall immediately cause such convict to be removed to the hospital, and must also report their names to the Governor, in order that proper steps may at once be taken for their removal.” § 14-3-42, Ala. Code 1975.
The Committee Comments to Rule 25.2, Ala. R.Crim. P., cite Lynch v. Baxley, 744 F.2d 1452 (11th Cir.1984), which offers persuasive authority regarding the issues behind Bentley’s pending confinement as a mentally ill individual in an ADOC facility.
*421 In Lynch, the plaintiffs sought to enjoin Alabama officials from detaining in county jails persons awaiting involuntary-commitment proceedings for mental illness. 744 F.2d at 1454. The United States Court of Appeals for the Eleventh Circuit held that such individuals must “be detained in the nearest state, regional, community, county or private hospital or mental health facility which provides quarters for mentally ill patients,” rather than in county jails. 744 F.2d at 1462.
Similarly, the Alabama Attorney General issued a 1986 opinion in response to the question: “If the Probate Court commits a person to [ADMH] and [ADMH] refuses to take the said person, what is the Sheriffs duties as far as release or confinement?” Ala. Op. Att’y Gen. 87-00018, at 1 (Oct. 16, 1986). The attorney general opined: “If [ADMH] refuses to accept such a person, then the ... Court must determine where such a person is to be placed.... [A] mentally ill person must be placed in a facility equipped to care for him.” Id., at 2 (citing Lynch, 744 F.2d at 1459 (emphasis added)).
Those suffering serious mental disease do not belong in prisons, and convicted criminals do not belong in mental hospitals. This is self-evident. Article III of the Alabama Constitution of 1901 is titled “The Distribution of Powers of Government.” However, power is not distributed among only the legislative, executive, and judicial departments. The decentralization and distribution of powers is systemic and inheres in Alabama’s government at the various levels of city, county, and state government and among the various departments at each level.
The distribution of powers “has a history older than the State of Alabama; as old, indeed, as constitutional liberty on this continent.” Scott v. Strobach, 49 Ala. 477, 482 (1878). “The decentralization of power ... was a controlling, fundamental maxim with the founders.” Id. James Madison stated that “[t]he accumulation of all powers ... in the same hands, whether of one, a few, or many, ... may justly be pronounced the very definition of tyranny.” The Federalist No. 47 (James Madison). “The purpose of this article of the Constitution was to separate and distribute the powers of the government, and to prevent their centralization.” Scott, 49 Ala. at 488 (emphasis added). The Court in Scott stated that “[ajll the objects which governments are instituted to accomplish, and all individual rights, depend principally, if not exclusively, upon the observance and preservation of this distribution of power.” 49 Ala. at 483 (emphasis added).
“Has it ever been thought that the executive and ministerial, and indeed, in some instances, the judicial or quasi judicial, functions of the tax assessor, tax collector, county treasurer, coroner, county surveyor, and clerks of courts, to which may be added the officers and boards of control of our state institutions for the care of the insane and deaf, dumb, and blind, and our state and county medical boards for the preservation of the public health, properly belong to the several state bodies of magistracy created by the constitution, within the spirit and intent of that instrument, and must therefore be confided to the exclusive exercise of those bodies? None will so declare.”
Fox v. McDonald, 101 Ala. 51, 69, 13 So. 416, 419 (1893) (emphasis added).
The ministerial function of caring for the mentally ill does not belong to the executive, judicial, or legislative branches. This function or power is separate and is distributed to ADMH as a public corporation, see § 22-50-4, Ala.Code 1975, and similar institutions. Likewise, the ministerial functions performed by ADMH and like insti *422 tutions do not properly belong to ADOC. ADMH and ADOC exercise different powers and functions — the former rehabilitative and restorative, “mental health services and mental retardation services,” § 22-50-9, and the latter “penal and corrective,” § 14-1-1.2. The trial court’s apparent confusion of ADOC’s penal and corrective power with ADMH’s restorative and rehabilitative power is, in principle and in practice, a violation of the distribution of powers in Article III of the Alabama Constitution.
I conclude that a facility operated by ADOC is not an “other public facility” under Rule 25. There is no basis in Alabama law for the trial court to order ADMH to transfer Bentley to an ADOC facility. Our 2009 decision in Ex parte Alabama Department of Mental Health provides no support for the Court of Criminal Appeals’ decision to uphold the transfer order. ADOC has no legal jurisdiction over non convicted, mentally ill persons; the power to care for such persons has been distributed to ADMH and other similar institutions. Because ADMH has a clear legal right to prevent the transfer of mental-health patients to facilities that are not public facilities for mental-health services, and because there is no basis in Alabama law for the trial court to order Bentley’s transfer to an ADOC facility, I would hold that ADMH is entitled to the writ of mandamus directing the trial court to vacate the transfer order.

C. Fraud on the Court

Furthermore, I believe the trial court in this ease may consider whether Bentley has perpetrated fraud upon the court. Fraud upon the court is “ ‘ “that species of fraud that defiles or attempts to defile the court itself or that is a fraud perpetrated by an officer of the court, and it does not include fraud among the parties, without more.” ’ ” Johnson v. Neal, 39 So.3d 1040, 1044 (Ala.2009) (quoting Christian v. Murray, 915 So.2d 23, 28 (Ala.2005), quoting in turn other cases). Fraud on the court is, “ ‘ “[i]n a judicial proceeding, a ... party’s misconduct so serious that it undermines or is intended to undermine the integrity of the proceeding.” The cases in which fraud on the court has been found, for the most part, have been cases in which there was “the most egregious conduct involving a corruption of the judicial process itself.
39 So.3d at 1044 (quoting Christian, 915 So.2d at 28, quoting in turn Black’s Law Dictionary 686 (8th ed. 2004)). The fraud-on-the-court doctrine has been applied in criminal cases in Alabama:
“There is a principle of law, that if a fraud on the court be attempted, in the getting up of false testimony, or by any other artifice tending, or designed to deceive or mislead, or to make the false appear to be the true, and this is knowingly assisted, or procured to be done by the suitor, this is a circumstance which the jury may rightly consider, to the disadvantage of the party making, or assisting in such attempt.”
Beck v. State, 80 Ala. 1, 2 (1885) (emphasis added); see State v. Vance, 80 Ala. 356, 357 (1885) (citing Beck, supra); and Parker v. State, 10 Ala.App. 53, 56, 65 So. 90, 90-91 (1914) (quoting Beck, 80 Ala. at 1). The application of the doctrine is limited to the more egregious forms of subversion of the legal process.
“ ‘Fraud on the court’ has been defined as ‘fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.’ Such fraud must be ‘extrinsic, ’ that is, perpetrated to obtain the judgment, rather than ‘intrinsic.’ ...
*423 “ ‘ “Perjury and fabricated evidence are evils that can and should be exposed at trial, and the legal system encourages and expects litigants to root them out as early as possible.... Fraud on the court is therefore limited to the more egregious forms of subversion of the legal process, ... those we cannot necessarily expect to be exposed by the normal adversary process.” ’ ”
Hall v. Hall, 587 So.2d 1198, 1200-01 (Ala. 1991) (citations omitted; emphasis added).
The trial court below summarized ADMH’s position on (and doubts about) Bentley’s mental health:
“[Fjrom the time Bentley arrived at Taylor Hardin in February of 2005, its medical providers have believed that he has been faking mental illness.... [A]s soon as Bentley learned he could not be re-tried for capital murder of Jamie Tol-bert, he dropped all pretense of suffering from mental illness. The records reflect that Bentley admitted that he had been faking mental illness all along, and it is clear [ADMH] staff members and medical providers believe his admission. [ADMH] believes that Bentley is simply a cold-blooded psychopath, and while Bentley is extremely dangerous and likely to kill again, he does not suffer from a treatable illness.”
In short, Bentley’s primary-care providers, who have eared for him on a daily basis for over eight years, believe he has been faking mental illness all along. His primary-care providers believe he does not suffer from a mental illness. However, two expert witnesses believe Bentley suffers from several mental diseases, and, on that basis, the trial court has ordered Bentley confined in an ADOC facility.
These facts raise the possibility that Bentley obtained his judgment of not guilty by reason of mental disease by perpetrating a fraud upon the court. Judgments procured by fraud may be vacated. Maddox v. Hunt, 281 Ala. 335, 341, 202 So.2d 543, 548 (1967) (“Courts of equity will set aside and vacate judgments procured by fraud.”). Potentially, the State might bring an “independent action ... to set aside or vacate a judgment procured by fraud.” Ex parte Burlington N. R.R., 470 So.2d 1094, 1095 (Ala.1985). It is true that “[t]he Declaration of Rights provides, that ‘no person shall, for the same offense, be twice put in jeopardy of life or limb.’ ” Moore v. State, 71 Ala. 307, 309 (1882) (quoting Art. 1, § 10, Ala. Const. 1875 (now Article 1, § 9, Ala. Const. 1901)). However, “if the former conviction was procured by the fraud, connivance, or collusion of the defendant, this fact vitiates it, and it is no bar to a subsequent prosecution.” 71 Ala. at 311. See also Baldwin v. State, 47 Ala.App. 136, 140, 251 So.2d 633, 637 (Crim.App.1971) (same, quoting Moore).
The Moore Court explained the procedure for such a subsequent prosecution:
“If the State intends to avoid the force of the plea of former conviction, or acquittal, by showing that the proceedings in the former case were fraudulently designed to shelter the defendant from the punishment justly due his offense, such facts must be set up by replication [1] to the plea.”
Id. The Moore Court cited as authority State v. Lowry, 31 Tenn. (1 Swan) 34, 35- *424 36 (1851), the relevant portion of which reads as follows:
“[T]his proceeding before the justice was in fraud of the law and in contempt of the court.
“... [W]e cannot wholly disregard it without permitting, in cases like the present, an injurious conflict of jurisdiction and a perversion of the public justice.
“The proceeding before the justice, instituted by the witness as a pretended prosecutor, with the probable collusion of the defendant, was in bad faith — was intended to favor the accused, and not to punish him for his offence — and was in its circumstances a fraud upon the jurisdiction of the circuit court.”
The Moore Court also cited State v. Little, 1 N.H. 257, 257-58 (1818) (“[T]he issue, as to the fraudulent procurement of the conviction before the justice, was a material issue; and that the conviction, if found to have been obtained by the covin[2] of the defendant, would be no bar to the present prosecution.”), and State v. Reed, 26 Conn. 202, 208 (1857) (“[I]f the conviction in question had been procured by the fraud and collusion of the defendants, on which point there are respectable authorities to show that it would be void.”).

IV. Conclusion

ADMH’s petition did not seek relief from the portion of the trial court’s order that denied the motion to release Bentley. If the court had granted ADMH’s petition, we could have restored the status quo and left Bentley in ADMH’s custody. Instead, Bentley will be transferred to an ADOC facility, which will likely guarantee the release of this highly dangerous man. ADOC’s amicus brief noted “there is no guarantee a habeas corpus or injunctive relief petition [Bentley] could subsequently file would not be granted and result in Bentley’s immediate release, the very result the Circuit Court and [the district attorney] seek to avoid.”
This Court should seek to avoid that result as well. I believe that ADMH should file a motion to modify the order transferring Bentley to an ADOC facility by requesting that ADMH retain custody of Bentley under Rule 25.7(a), Ala. R.Crim. P. (“For good cause, the court may modify any order entered under Rule 25.6 at any time.”). Also, I believe that the State should seek an independent action to set aside the trial court’s order finding Bentley not guilty by reason of mental disease or defect because that judgment was obtained by a fraud upon the court. Then Bentley’s original sentence could be reinstated or Bentley could be retried, as the trial court may determine. In any event, Bentley should be retained in custody and should pay the penalty for the crimes for which he was originally convicted. One thing to which we all agree is that Bentley is a danger to society and should not be released among the general public.
For these reasons, I respectfully dissent from the Court’s decision to deny ADMH’s petition for a writ of mandamus.

. Replication is an equity or common-law pleading. Replication per fraudem is a common-law pleading "asserting that the discharge pleaded by the defendant was obtained by fraud." Black's Law Dictionary 1414 (9th ed. 2009). Discharge in this context means "[t]he release of a prisoner from confinement.” Id., at 530.

. Covin is "[a] secret conspiracy or agreement between two or more persons to injure or defraud another.” Black’s Law Dictionary, at 422. As an adjective, covinous means "[o]f a deceitful or fraudulent nature.” Id.